

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

NO. AP-75,654

**THOMAS BARTLETT WHITAKER, Appellant**

**v.**

**THE STATE OF TEXAS**

ON DIRECT APPEAL
FROM CAUSE NO. 42,969 IN THE 400TH DISTRICT COURT
FORT BEND  COUNTY

HERVEY, J., delivered the opinion of the Court in which KELLER, P.J., MEYERS,  WOMACK, KEASLER, HOLCOMB and COCHRAN, JJ., joined.  PRICE, and JOHNSON,  JJ., concurred.

### O P I N I O N

Appellant was convicted of capital murder and sentenced to death.  He raises nine points of error.  Finding no merit in any of these points, we affirm the judgment of the trial court.

Appellant does not challenge the sufficiency of the evidence to support his conviction.  We, therefore, set out only a brief summary of the facts.  The evidence shows that appellant led his family to believe that he was enrolled in college and was about to graduate.  None of this was true.  On

December 10, 2003, appellant and his father, mother and younger brother went out to dinner to celebrate appellant's "graduation." When they arrived home, appellant's roommate (Brashear) was inside, and he shot and killed appellant's mother and brother and wounded appellant's father as they entered the home. Appellant knew that Brashear was waiting inside the home intending to murder appellant's entire family. He knew that another individual (Champagne) was waiting outside in a getaway car.[1] Since at least 2000, appellant had planned with several other individuals, at different times, to murder his family.[2] He made at least one unsuccessful attempt to murder his family prior to December 10, 2003. His motive was money.

In June 2004, as the police investigation focused on appellant, appellant stole $10,000 from his father and fled to Mexico where he was apprehended about 15 months later. Appellant's father (Kent) hired a lawyer to represent appellant. Appellant's family attempted to persuade the prosecutor not to seek the death penalty against appellant. Appellant's original lawyer, or another lawyer in his office, also made a written "proffer" to the prosecutor. This proffer apparently contained admissions of guilt by appellant, appellant's offer to plead guilty in exchange for two consecutive life sentences, and appellant's father's plea to the prosecutor to accept the offer. This proffer was not admitted into evidence and is not part of the appellate record.

Appellant was represented by another lawyer at trial. The defense all but conceded

---

[1] The evidence also shows that appellant walked past his wounded father, his dying mother and his dead brother so that Brashear could shoot appellant in the shoulder, as they had planned, in order to direct suspicion away from appellant's involvement in the offense.

[2] Champagne testified that, in February 2004, appellant "was talking about how his father survived, and it wasn't finished."

appellant's guilt at the guilt phase.[3] At the punishment phase, appellant's mitigation case was, among other things, that appellant was sorry and that neither his father nor members of his mother's side of the family wanted him to be sentenced to death and that these family members had to bear the ordeal of a trial because the State would not accept appellant's offer to plead guilty in exchange for the two consecutive life sentences. Emphasizing that the State did not seek the death penalty against the shooter (Brashear),[4] the defense also seemed to suggest that the prosecution unfairly sought the death penalty against appellant over issues related to the proffer. The defense argued to the jury at the punishment phase:

> The bottom line, too, is, let's just talk about this: How we got here, how you actually got into these chairs. All right? After all of the crimes that were committed, and the coward is running, [appellant] was actually retrieved and put in jail. He has a lawyer, a long-time friend of Bo Bartlett's, Dan Cogdell, who is a very good lawyer. I used to office with him at one time, I've tried cases with him. He is a good lawyer. And he comes in, and he's talking to, I guess the prosecutor, Mr. Felcman, who has been involved in this case from day one. And whatever communications they're having, I don't know. I have no idea what they were talking about, but, obviously, there is some miscommunication going on, because they're talking about trying to settle this case at that time, trying to not have a jury in the box to make a life-and-death decision, not having to put the Whitakers and the Bartletts through this horrible event, and somehow it breaks down. Now, where does it break down? We know. We know by the way that Mr. Felcman reacts in the courtroom with it. It breaks down with this phone call to [appellant's] dad talking about a number of years. You know, "bring in the big guns." You know, Dan Cogdell is a big gun, there's no question about it. Okay? And apparently, somebody else in his office has been over there preparing proffers, and the proffers are wrong, and they're not even [appellant's]. He told you that yesterday. So, obviously, Mr. Felcman, "Well, you know, I look at this case, and this manipulation, I see this conspiracy thing going on,

---

[3]
The evidence of appellant's guilt is overwhelming. We also note that, during its closing jury arguments at the guilt phase, the defense stated that appellant is "absolutely guilty," but still urged the jury to examine the evidence until it knew that "the State actually has proven their case."

[4]
Members of appellant's family testified that a life sentence would be an appropriate punishment for appellant especially since the State did not seek the death penalty against Brashear.

and you know what? That guy hasn't learned his lesson yet." That's what he's thinking. "You know, I'm not going to be manipulated with lawyers, I'm not going to have 'Lawyer 101' played on me. I'm not going to do that." And they make the decision to seek the death penalty, the only two options in that case. For whatever reason, Mr. Cogdell is off the case, and I'm on the case. I don't know one fact about this case other than what I might have read in the paper, and I probably wouldn't have paid any attention to it, to be honest with you. And I come in here, and the first day that I actually come into court and substitute in, I go to the District Attorney's office and meet with Mr. Healey and Mr. Felcman, and we are talking about trying–they're already seeking the death penalty–trying to resolve this case, and we are offering to plead to a life sentence. That's not something taken lightly. We are offering to end this and to put him in the penitentiary for life. That is rejected. I do get familiar with the facts, and they are horrible facts, killing of one's family, a mother and brother. We come back, we offer more, more life sentences. We bring the family in. We bring Bo Bartlett in here. And, you know, he is an incredible person. I don't really know him, but that testimony yesterday, he is telling you the honest truth about this case. He is a victim. His family is a victim. We're telling the same things to the prosecutor, Mr. Healy and Mr. Strange. More life sentences, any way you want to structure it for him to be in life–in prison for life, and he is going to plead guilty, you know. That's almost why it bothers me so much when they say, "Why didn't you just plead guilty? Why didn't you just plead guilty?" We have offered to plead guilty. That offer was never withdrawn. It's open right now, throughout the trial. And you need to know those facts. Okay?

\* \* \*

Now, let's look at this. The State, in pursuing this instead of settling it–and it's certainly their call, and I cannot do a thing about it. We come in here, and we have to have this trial. I told you before, there was no need for trial. You understand why I was saying that now. That did force the State to bring these people in here and talk about it.

In his first two points of error, appellant complains first about references by the State to the proffer and to plea negotiations (point of error two)[5] and then about the trial court's failure to include

---

[5] In point of error two, appellant claims that "repeated references by the state to the proffer and the plea negotiations" violated TEX. R. EVID. 410(4), which generally requires the exclusion of "any statement made in the course of plea discussions." Rule 410(4) provides:

Except as otherwise provided in this rule, evidence of the following is not admissible against the defendant who made the plea or was a participant in the plea discussions:

(4) any statement made in the course of plea discussions with an attorney for the

the proffer in the record (point of error one). Although the proffer is not actually included in the record, many references were made at trial to its speculative content, some by the State, some by the defense, some during the guilt phase and some during the punishment phase. A review of all of these references leads the Court to conclude that the proffer and the plea negotiations were a significant part of appellant's mitigation case at punishment to show that appellant was willing to plead to as many life sentences as the State wanted in order to take responsibility for his crime and to spare his already victimized family the ordeal of a trial.

Appellant cites to the following portions of the record in support of his claim in point of error two that the State impermissibly referred to the proffer and to plea negotiations. The record reflects that appellant's father, who was the State's first witness at the guilt phase, mentioned the proffer when the State was questioning him on direct examination about a conversation appellant's father had with appellant in jail following appellant's apprehension in Mexico and return to Texas.

> Q. [STATE]: You sent out an e-mail to people, after you'd talked to the Defendant, that he seemed to be repentant?
>
> A. [KENT WHITAKER]: Yes, he was.
>
> Q. Would you tell me, what he was repentant about, Mr. Whitaker?
>
> A. I hadn't seen my son in 15 months. He walked in, and there was the bulletproof glass separating us, and he looked down, and I think I told him that I missed him and he looked good. And he said, "Dad, I'm so sorry. I'm sorry for everything. I'm

---

prosecuting authority that does not result in a plea of guilty or a plea of nolo contendere or that result in a plea, later withdrawn, of guilty or *nolo contendere*. However, such a statement is admissible in any proceeding wherein another statement made in the course of the same plea or plea discussions has been introduced and the statement ought in fairness be considered contemporaneously with it.

(Italics in original).

going to do everything in my power to make this as easy and painless as possible for everyone." And it was at that moment that I realized that he was–

Q. [STATE]: Guilty?

A. –he was guilty and willing to confess.

Q. There was no confession, though at any time, was there?

A. There was no confession. There was a proffer offered to the District Attorney's office a year and, what, three or four months ago.

Q. Uh-huh. You know, of course, that proffer was absolutely inadmissible, and I could not have used it for any purposes. You understand that?

A. No, I didn't understand that.

Q. Okay.

A. And I don't know that [appellant's] attorney at the time understood that.

Q. His attorney was Dan Cogdell at that time?

A. That's correct.

Q. Dan's a pretty high-profile attorney, though, isn't he?

A. He's a very high-profile. He's a friend of the family.

Q. So, the remorse or repentance that my office received was–let me ask you this: Did the Defendant prepare that, or did one of Dan Cogdell's partners prepare that?

A. I don't even think it was a partner. I found out much later–in my visit with you, what, six weeks ago, that was at the time I found out that [appellant] had not written the proffer, and that you were offended by the tone of it, and that was when I knew that Jimmy–I can't think of his last name–anyway, one of Dan's junior assistants, I'd heard had written that up.

Q. There was no legal repentance, there was nothing. There was legal maneuvering on your son's part. Am I correct on that?

A. What?

Q. He–he repented to you, but he didn't put his neck on the line about this case, correct?

A. As I understand it, it would have been–Dan would not have allowed him to.

Q. Uh-huh.

A. I think that the problem broke when Dan and you did not seem to realize that [appellant] was trying to confess to this.

Q. Tell me something. You know me, as a prosecutor, that I cannot talk to the Defendant. You know that?

A. You told me that in your office six weeks ago. I did not know that before. In fact, that was one of the things I wondered, if there was a concern about [appellant's] sincerity, why wasn't there some contact?

Q. I can have absolutely no contact.

A. I did not know that.

Q. But Dan Cogdell, the high-priced attorney that you paid, knew that, wouldn't you have assumed?

A. I would assume he would.

Q. And even as of today, I cannot contact the Defendant. You understand that?

A. All right.

During the punishment phase, appellant's father testified on direct examination by the defense that an offer was made on appellant's behalf to accept stacked life sentences.[6] Appellant

---

[6]

Appellant's father testified.

Q. [DEFENSE]: Have we ever, ever proposed on Bart's behalf anything other than pleading to a life sentence for capital murder straight up?

A. [APPELLANT'S FATHER]: No. That is the only thing we've ever - - and it is what I begged the District Attorney's office to take when we met before you came on the scene.

similarly testified on direct examination by the defense at the punishment phase and also testified

that he never intended to contest his guilt.

Q. [DEFENSE]: Mr. Whitaker, you are convicted of capital murder?

A. [APPELLANT]: Yes, sir.

Q. Did that come as any surprise to you?

A. No, sir, not at all.

Q. In the entire time I've been representing you, have we ever offered a defense?

A. No, sir, not on guilt or innocence.

Q. Have you actually tried to, and before I knew any facts of this case, have me go to the District Attorney's office and plead to any amount of time that they wanted to?

A. As many life sentences as they wanted, sir.

* * *

Q. In our discussions, have we ever talked about anything with regard to any defense?

A. No, sir.  No, sir.

Q. Have we always, since I've been involved in this case since April, tried to conclude this matter in a way that you are confined for life and we didn't have to go through this, and we didn't have to have these citizens come up and make this call?

A. That's what I wanted more than anything else.

Appellant mentioned the proffer when the prosecutor was cross-examining appellant about

a Christmas card that appellant sent to the prosecutor (appellant wrote in the Christmas card that the

---

Q. And have we even tried to do it in such a way that they could stack life sentences, if they wanted to?

A. Yes.  In fact, as I understand it, that was really the first and only offer we've ever made. Yes, [appellant] was willing to accept stacked sentences, which, as I understand, means that the sentence given for the first murder had to be completed in its entirety before the second one even began.

prosecutor should "focus on [the prosecutor's] family").

Q. [STATE]: Was it a little bit of an attempt by you, Mr. Whitaker, to somehow manipulate me into this somehow along the line.

A. [APPELLANT]: I only wanted to talk to you.

Q. All you had to do was call up your attorney and say, "I want to talk."

A. I have done that, sir.

Q. You think this attorney has actually said that I could sit down and talk to you?

A. Mr. Felcman, it was my impression back when Dan Cogdell was my attorney that that was what I had relayed to him was what I wanted to do; that when we wrote the proffer, which was extremely poorly handled, that that was what I wanted to do. I felt that if you and I could sit down for just a few minutes, an hour or two, that you would either decide I was lying or not, but if you decided I was lying, we wouldn't be any place other than where we are today. But if you decided I wasn't, that we could somehow save my family all of this. That's what I wanted with the letter more than anything.

Q. You wanted to manipulate me through your family, so I wouldn't seek the death penalty?

A. No, sir. You turned my words around.

The State later used the actual proffer during its cross-examination of appellant including having appellant read it silently to himself and then answering questions about it.

Q. [STATE]: You also mentioned something about a proffered statement. Remember that?

A. [APPELLANT]: I - - yes, sir.

Q. May I approach him, Judge?

A. [COURT]: You may.

Q: Don't read this out loud to the jury. Do not read it out loud to the jury, but read this to yourself.

A. [APPELLANT]: (Reading)

Q. Is that true?

A. I did not write that.

Q. You didn't write it?

A. No. I – I wanted to write the proffer. That was some confusion between me and Mr. Cogdell at the time when initially - - I guess it was your office that suggested that if we wrote the proffer, we could all end this. It was my impression that I would write this admission of guilt.

Q. It wasn't my suggestion.

A. I'm sorry?

Q. Your father poured his heart out to me, and I saw no remorse on your part.

A. I didn't actually write that. The one that I wrote was in my cell, and it did have remorse. It was really how I felt at the time, and I didn't - - I was under the impression that I was going to be giving that copy to Mr. Cogdell, and then I find out - - I guess I didn't see him for a few weeks. I found out the next time that I talked to him that a proffer had been rejected. I was very confused, because it was my understanding that I would be writing it myself.

Q. The proffer that presented–that you didn't even have anything to do with. You understand how insulting that is to somebody that has to listen to the father plea, and I see no remorse on the Defendant?

A. Yes, extremely insulting. I knew it would be, if it had been done that way. I wouldn't have agreed to that at all. I was very upset about that.

Appellant's complaint about the testimony referring to the proffer and to the plea negotiations is difficult to understand since it appears that this information formed a significant part of his mitigation case. Further, while it can be argued that the testimony about the proffer and the plea negotiations during State questioning was non-responsive, the record clearly reflects that appellant made no objection to the State's references to the proffer and to the plea negotiations. Appellant,

therefore, procedurally defaulted any error in these references. *See* TEX. R. APP. PROC. 33.1.

The State also argues that any error in its references to the proffer and to the plea negotiations was harmless because these references "did not influence the jury, or had but a slight effect." *See Johnson v. State*, 967 S.W.2d 410, 417 (Tex.Cr.App. 1998) (criminal conviction should not be overturned for non-constitutional error under TEX. R. APP. PROC. 44.2(b) if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect); *King v. State*, 953 S.W.2d 266, 271 (Tex. Cr.App. 1997) (Rule 44.2(b) harm standard is whether erroneous admission of evidence "had a substantial and injurious effect or influence in determining the jury's verdict"). Omitting citations to the record and to case law, we set out portions of the State's brief:

> In this case, Appellant testified that his guilt was never an issue and that he never planned to mount a defense to the charges against him at the guilt or innocence phase of trial. Therefore, any questions to Kent Whitaker during the guilt or innocence phase of trial regarding plea bargaining or the proffer of evidence were not harmful in any way to Appellant.
>
> As for punishment, defense counsel was the first to address plea bargaining through the testimony of Kent Whitaker. Kent testified that an offer was made on Appellant's behalf to serve two stacked life sentences and that he and Appellant had been pursuing a life sentence "since the day [Appellant] was arrested." Next, Appellant testified on direct examination that he offered to plead to "as many life sentences as [the District Attorney's Office] wanted." He testified further that his ultimate goal was to work out an agreement for a life sentence and as a result, a trial would not have been necessary. Appellant again urged the issue in response to a question on cross-examination. In fact, without even being asked about a proffer of evidence, Appellant stated that prior to trial, he had wanted to talk to the prosecutor in this case and that the written proffer of evidence had been drafted by himself and his attorney in an attempt to avoid the death penalty.[7] It is clear from the record that counsel was

---

[7] The portions of the record set out above indicate that appellant initially testified on cross-examination by the State that he and his lawyer (Cogdell) "wrote the proffer" but later testified on cross-examination by the State that he "didn't actually write that."

attempting to show Appellant's willingness to accept responsibility for his actions and save his family and the taxpayers the trouble of going forward with a trial. Counsel's questions revealed the fact that despite Appellant's willingness to accept two life sentences and admit his guilt in this case, the State chose to seek the death penalty. Any follow-up questions by the prosecutor regarding plea negotiations or the proffer of evidence did not have "a substantial and injurious effect or influence in determining the jury's verdict." As discussed, *supra*, the jury heard evidence that Appellant planned the cold-blooded murder of his family not once, not twice, but *three* times before he succeeded in ending the lives of his mother and brother. To that end, the jury heard how Appellant sat across the dinner table from his mother and brother accepting congratulations and a Rolex watch, all the time knowing they were about to be killed pursuant to his plan. Accordingly, Appellant's conviction should not be overturned because this Court can have "fair assurance" that the prosecutors [sic] unobjected-to questions did not influence the jury, or had but a slight effect.

(Emphasis in original).

We agree with the State that the references to the proffer at the guilt phase by appellant's father during his direct examination by the State was harmless. We do not believe that these references to the proffer had a substantial or injurious effect or influence in determining the jury's verdict at the guilt phase in light of the overwhelming evidence of appellant's guilt. *See Motilla v. State*, 78 S.W.3d 352, 356-57 (Tex.Cr.App. 2002) (overwhelming evidence of guilt is factor to consider in harm analysis); *King*, 953 S.W.2d at 271.

We also agree with the State that the references to the proffer and to the plea negotiations at the punishment phase by appellant and his father during their cross-examination by the State, after the defense had arguably opened the door to this evidence during its direct examination of these witnesses, also did not substantially or injuriously influence the jury's verdict at the punishment phase. *See id*. We do not believe that the jury's answers to the special issues turned on these references to the proffer and to the plea negotiations. *See id*. We further note that the defense relied heavily on the plea negotiations in support of its mitigation case that appellant was willing to accept

responsibility and plead guilty to as many life sentences as the State wanted in order to spare his family the ordeal of a trial. This is another reason for deciding that any error in the State's references to the proffer and to the plea negotiations was harmless. *See Leday v. State*, 983 S.W.2d 713, 715-18 (Tex.Cr.App. 1998) (erroneous admission of evidence is harmless when same evidence is introduced by either the defendant or the State and is admitted without objection).[8] Point of error two is overruled.

Appellant claims in point of error one that the trial court erred in refusing to allow appellant "to develop his appellate record on motion for new trial so that the appellate record would be complete on appeal." He argues on appeal:

> [i]n order for the defendant to have a complete record on appeal to render effective assistance of counsel, it was necessary for the Defendant to have the [proffer] which the State's attorney used in such a manner in front of the jury, and any wording of limitations that it had on it. It was also necessary to have the Attorney for the State testify as to the reasons and the justifications for his actions at this time and the other times that he questioned his witnesses concerning the proffer statement made by the Defendant.

The record reflects that a new lawyer was representing appellant when a motion for new trial was filed. Appellant claimed in this motion for new trial that the appellate record would not be

---

[8] We note that the State was arguably entitled to cross-examine the defense witnesses (appellant and his father) about the proffer and the plea negotiations to rebut or correct the impression these witnesses left during their direct examination by the defense. *See Renteria v. State*, 206 S.W.3d 689, 697 (Tex.Cr.App. 2006) (party may open the door to otherwise inadmissible evidence to correct false impression for which it was responsible). Through its direct examination of these witnesses at the punishment phase, the defense attempted to paint a picture that appellant was remorseful and was willing to take responsibility for his actions by pleading guilty for stacked life sentences to spare his already victimized family the ordeal of a trial. The State arguably was entitled to rebut this through its cross-examination of these witnesses suggesting that appellant was not remorseful and that he used his family and the plea negotiation process as part of a calculated strategy, not to take responsibility for anything, but to avoid the ultimate punishment.

complete without the proffer:

> [t]hat prior to trial, the Defendant's attorney in the negotiation of a possible plea, gave to the attorney for the state, an evidentiary statement concerning the facts of the pending criminal action. Pursuant to the agreement, the statement was not to be used for any purpose unless a plea agreement was reached. A plea agreement was not reached. However, in violation of the agreement, the attorney for the state used the evidentiary statement during the trial of the defendant, by exhibiting the statement in front of the jury and questioning the Defendant from the document. Such action on the part of the attorney for the state denied the Defendant a fair trial, and was of such moment during the hearing on punishment that this Court should reform the judgment of death and modify the sentence to life imprisonment.

Appellant's new lawyer filed an affidavit in support of the motion for new trial. This lawyer stated in this affidavit:

> In my interview with the Defendant, Thomas Barlett [sic] Whitaker, I began discussing the punishment hearing. He indicated that his [trial] attorney had given the State a proffer of evidence during their plea negotiations. The State had refused to consider life after receiving the proffer of evidence, and the case went to trial. During the punishment phase of the trial and while the Defendant was testifying, the attorney for the state held the proffer in his hand and approached the witness, and asked [him] to read a portion of it silently. He then asked him if he said that, to which the Defendant said NO. No further mention was made of the Proffer. I verified with the trial attorney that the incident had indeed happened in front of the jury. However, he did not remember the question that was asked of the Defendant. I have tried to get a copy of the proffer of evidence from the trial attorney and the attorney that gave it to the state but they have not been able to locate the proffer of evidence. Because the Defendant is no longer in the Ft. Bend County Jail, it is necessary for me to detail my knowledge in this matter as it is impossible for me to timely get his affidavit for filing the motion for new trial.

The record also reflects that the trial court held a hearing during which appellant's lawyer requested that the State produce the proffer for "an appellate court to be able to see the document that was used, and they can make their judgment."

> [DEFENSE]: And so the only other thing I need besides that is the document that--
>
> [STATE]: You want to put it–make it admissible in evidence, a document your client's former attorney--

[DEFENSE]: No, I don't want to put it in evidence.

[STATE]: That's what I'm trying to figure--

[DEFENSE]: I want an appellate court to be able to see the document that was used, and they can make their judgment.

[THE COURT]: But if the contents of the document was (sic) never disclosed, was not read, was not introduced, the jury never saw it, it was a piece of paper–it could have been blank for all the jury knows–what relevance does that document have in terms of the record in this case?

[DEFENSE]: Well, it was used for some thing. It was used for the purpose of a question and an answer. And I don't know–sometimes the documents themselves say that "this document is not usable for any purpose other than negotiation of a plea."

* * *

[STATE]: Yeah. So, he'd already been found guilty, so it doesn't have anything to do with guilt or innocence. And I seriously doubt me asking him to read a piece of paper silently, to himself, with one question, "Did it happen," and he says no, was of such a nature that the jury then gave him the death penalty because of that. I mean, it gets to the point where–I understand why [the defense] brought it in, but I was about as cautious as you could get, even though defense counsel brought up numerous times about plea bargaining, how his client was willing to do that. The fact is, I think my co-counsel, Jeff, said that I think the Defendant actually mentioned, before even approaching, about a proffered statement. I know the father did. But even then, I didn't mention the proffered statement or read it to a jury panel or anything like that. That's the reason for my objection on it. The record is quite clear. What [the defense] wants you to do is now error, "I want to put it in now, try to get error," which I don't think is fair or the purpose of a motion for new trial in any fashion. So. . .

[The defense] can come look at come look at my file, if he wishes, to the proffer on it, but it's not signed by your client, it's not--

The trial court denied appellant's request to make the proffer a part of the appellate record and his request for an evidentiary hearing on his motion for new trial. Appellant claims that this was error because it prevented him from making a complete record on appeal. He claims that, under this

Court's decision in *Reyes v. State*,[9] we should abate the appeal and "remand for an evidentiary hearing by the trial court with the authority to grant or deny the new trial request." The State claims that "the record clearly indicates what transpired during trial with regards to the written proffer" and that, therefore, there is "no need to develop the record any further."

We agree. The portions of the record set out above clearly indicate what transpired during trial with regards to the proffer. We are not persuaded that "reasonable grounds exist" for believing that remanding this case to the trial court to make the proffer a part of the appellate record could result in the granting of appellant's motion for new trial or of any other relief to appellant. *See Reyes*, 849 S.W.2d at 816. Appellant has not shown how supplementing the record with a document (the proffer) that apparently could only be used to support unpreserved claims on appeal would be of any further benefit to him. And, as previously stated, the proffer was not admitted, nor was it ever offered, into evidence. *See* Rule 410(4). Point of error one is overruled.[10]

In point of error three, appellant claims that his rights under the Texas and Federal

---

[9]

849 S.W.2d 812, 816 (Tex.Cr.App. 1993) (defendant entitled to hearing on motion for new trial when motion for new trial "reflect[s] that reasonable grounds exist for holding that" motion for new trial could be granted); *see also Rozell v. State*, 176 S.W.3d 228, 230 (Tex.Cr.App. 2005) (generally, a trial court should hold an evidentiary hearing on a motion for new trial if the motion and attached affidavit raise matters that are not determinable from the record and that demonstrate reasonable grounds that could entitle the accused to relief).

[10]

Appellant also claims that he is entitled to a remand for development of the record on the State's reasons for seeking the death penalty in this case. Appellant, however, is not entitled to a remand for development of the record on this issue. *See Hankins v. State*, 132 S.W.3d 380, 388 (Tex.Cr.App. 2004) ("[Defendant] now claims that his Sixth Amendment rights were violated because he was prevented from developing evidence that would call his selection as a death-penalty candidate into question. However, [defendant] was not entitled to subpoena District Attorneys and question them regarding the exercise of their discretion which we have held to be constitutional. Thus, the trial judge was not required to allow appellant to present such evidence and did not err by overruling appellant's motion and by quashing the subpoenas.").

Constitutions were violated because the State's decision to seek the death penalty "was not made with respect to any guidelines," resulting in a nonuniform "application of the law under which [he] was tried and sentenced to death." He argues:

> There were three defendants involved in the murder case for which the Defendant was tried. Steven Champagne was given a plea bargain of fifteen years. He drove the getaway car from the scene of the shooting. The state agreed not to seek the death penalty against Christopher Brashear. He was the person who actually fired the shots that killed the Defendant's mother and brother and wounded the father of the Defendant. (Footnote omitted). The Defendant alone was tried on the capital case in which the state sought and obtained the penalty of death.[11]

---

[11] We note that the State argued to the jury during the punishment phase that it sought the death penalty against appellant for the "right reasons."

> [STATE]: We have been in trial now–and you were all here on the first day–for almost two months now. What did we get out of this? What enjoyment have you seen Fred and I have during this last couple of weeks? You know, rationally, do we have any motive to present this case to you as a death penalty case unfairly? We have a solemn obligation to look at the facts of each case and decide what is appropriate, and we've done that on each and every occasion. And Fred pretty much unequivocally stated our position on that Monday. I don't need to expound on that, but we have to look at the facts in each one of those cases and come up with an individual decision based on their unique set of circumstances. And if we're going to do our job properly, we have to take a look at Steven Champagne, Will Anthony, Justin Peters and even Chris Brashear and ask ourselves the question: Is it likely that any one of these people would have committed a violent crime if they hadn't met [appellant]? And I don't know them that well, but it seems to me that Steven Champagne and Will Anthony were doing quite well in the military when they were out of his life, but, gracious sakes alive, Justin Peters was a National Merit Scholar.

> Use your common sense. We've presented this case to you for the right reasons. We've presented this case to you, because, under the law and under the evidence, the death penalty is justified.
>
> * * *
>
> So, I don't quite understand this moral thing that Chris Brashear, because he killed the people, is more evil or more heinous than the Defendant. The Defendant took his family out and ate bread with them knowing they're going to be dead in a few minutes and brought them back to be assassinated. Chris Brashear was the weapon that the Defendant used to kill his family. He could have substituted another person

We have rejected the claim that "the Texas death-penalty statute is unconstitutional for its failure to provide a consistent state-wide method for determining in which cases the death penalty would be sought." *See Hankins*, 132 S.W.3d at 387. We have also recognized that prosecutorial discretion to seek the death penalty is not unconstitutional. *See id.* Point of error three is overruled.

In point of error four, appellant claims that the "trial court committed reversible error and denied the Defendant a fair trial by admitting the tape of the telephone conversation between Adam Hipp and the Defendant without deleting from the recording the inadmissible hearsay, the extraneous offenses and the other prejudicial matters." The record reflects that Adam Hipp plotted with appellant in the spring of 2001 to murder appellant's family. This plot was abandoned after a friend of Hipp's called the police. Several days after the murders in this case, Hipp provided the police with the information concerning the 2001 plot to murder appellant's family. With Hipp's cooperation, the police recorded several phone calls between Hipp and appellant before appellant fled to Mexico. In one of these phone calls, appellant offered Hipp money in exchange for Hipp's silence about the 2001 plot to murder appellant's family. The audiotapes of these phone calls (State's exhibits 109A through 109F) were admitted into evidence at the guilt phase of appellant's trial. The conversations on the audiotapes were played to the jury and are transcribed in the reporter's record and cover approximately 100 pages.

The record reflects that appellant made the following objections when the State offered the audiotapes into evidence through the lead detective (Slot) who assisted Hipp in recording the conversations:

---

in, but it's always the Defendant bringing the family back to be assassinated. And that says it.

[DEFENSE]: I'm going to object on two grounds: One, this is a conversation between Adam Hipp [sic] so I'm going to object. We object on hearsay, as well as **Crawford,** because it is testimonial. Even though he's laid a predicate for that tape to be offered, Adam Hipp is the one that has the conversation with him. To explain the accuracy of it, I don't think he's actually there for all these conversations.

[STATE]: Yes, he is.

[DEFENSE]: He is?

[STATE]: Uh-huh.

[DEFENSE]: Bottom line, I'm going to object to hearsay evidence, because this is the wrong person to enter this tape with. That's one objection. If that's overruled, I'd make the objection, I think these tapes contain comments about extraneous offenses, and I'm going to object to the extraneous offenses being offered at this time, because there's been nothing shown that the State needs to have any extraneous offense offered at this time to show intent and that sort of thing.[12]

Appellant claims on appeal that portions of the conversations on the audiotapes contained inadmissible hearsay, extraneous offenses, and "other prejudicial matters." In his brief, appellant provides what he characterizes as a "few of the examples" of the portions of the conversations on the audiotapes that he claims were inadmissible: (1) appellant was consulting with a "high-priced" lawyer shortly after the murders, (2) appellant and Hipp had stolen computers when they were in high school together, (3) the "murder theories and the statements of the witnesses that the police interviewed which Adam Hipp told [appellant] about during the telephone conversations," (4) the

---

[12]

The State claimed that the audiotapes were admissible for "multiple reasons."

[STATE]: Also–I'm sorry, Judge. Let me see. These conversations were also given to defense counsel, plus Adam Hipp will be testifying in this particular case. Second, they're also admissible to refute the Defendant's claims to the father that he did not know why the police were talking to Adam Hipp, because then it will show that he did know why and was trying to bribe him. It also contains bribery and thwarting the investigation, not just the other evidence. So, therefore, they're admissible on multiple reasons.

financial condition of appellant's father, and (5) a discussion that Hipp had with a lawyer. Appellant claims that his trial objections put the trial court on notice that it should have "removed all of the inadmissible references so that the recorded statements only contained the admissible evidence and not the prejudicial things of which examples have been mentioned."

On this record, we decide that appellant's trial objections were insufficient to preserve any error in the admission of any portion of the audiotapes because these objections did not specifically point out which portions of the audiotapes were objected to as inadmissible. *See Hernandez v. State*, 599 S.W.2d 614, 617 (Tex.Cr.App. 1980) (op. on reh'g) (when evidence is admitted, a part of which is admissible and a part of which is not, it is incumbent on the party objecting to the admissibility of the evidence to specifically point out what part is inadmissible to preserve the alleged error and, "[w]hile it might be conceded that [defendant's] objection sufficiently stated *grounds* for the objection, it did not identify what was objected to") (emphasis in original); *see also Human v. State*, 749 S.W.2d 832, 838 (Tex.Cr.App. 1988) (same). The trial court was not obligated to search through these audiotapes and remove "all of the inadmissible references so that the recorded statements only contained the admissible evidence." *See Jones v. State*, 843 S.W.2d 487, 492 (Tex.Cr.App. 1992)[13] ("The trial court need never sort through challenged evidence in order to segregate the admissible from the excludable, nor is the trial court required to admit only the former part or exclude only the latter part. If evidence is offered and challenged which contains some of each, the trial court may safely admit it or exclude it all, and the losing party, no matter who he is, will be made to suffer on appeal the consequences of his insufficiently specific offer or objection.")

---

[13] *Overruled on other grounds by Maxwell v. State*, 48 S.W.3d 196, 198 (Tex.Cr.App. 2001).

and at 501-02 (Baird, J., concurring and authorities cited) (same).

Moreover, we agree with the State that any error in the admission of these portions of the audiotapes was harmless in light of the overwhelming evidence of appellant's guilt. *See Motilla v. State*, 78 S.W.3d 352, 356-57 (Tex.Cr.App. 2002) (overwhelming evidence of guilt is relevant factor to consider in harm analysis). The jury would have convicted appellant with or without the portions of the audiotapes that appellant finds objectionable on appeal. *See id.* Moreover, any error in the admission of the portions of the audiotapes that appellant claims for the first time on appeal were inadmissible did not substantially influence the jury's verdict at either the guilt or punishment phases of trial. *See King*, 953 S.W.2d at 271. The jury would have convicted appellant and its answers to the special issues would have been the same with or without the portions of the audiotapes that appellant finds objectionable on appeal. *See id.* Point of error four is overruled.

In point of error five, appellant claims that the "present administration of a lethal injection to one who is sentenced to death is cruel and unusual punishment and violates the 8th and the 14th amendment (sic) to the United States Constitution." In point of error six, appellant claims that "the trial court erred in denying the defendant's MOTION TO HOLD UNCONSTITUTIONAL V.A.C.C.P. ARTICLE 37.071 SEC. 2(e) AND (f)-BURDEN OF PROOF." In point of error seven, appellant claims that the "trial court erred in denying the defendant's MOTION TO HOLD UNCONSTITUTIONAL V.A.C.C.P. ARTICLE 37.071 SEC. 2(e) AND (F)-FAILURE TO REQUIRE MITIGATION BE CONSIDERED." In point of error eight, appellant claims that "the trial court erred in overruling the Defendant's MOTION TO HOLD UNCONSTITUTIONAL THE 37.071(2)(b)(2) 'PARTIES SPECIAL ISSUE.'" And in point of error nine, appellant claims that "the trial court erred in overruling the Defendant's MOTION TO HOLD STATUTORY DEFINITION

OF MITIGATING EVIDENCE UNCONSTITUTIONAL AS APPLIED TO IMPOSE A NEXUS LIMITATION AND TO GRANT DEFENDANT'S REQUESTED CLARIFYING VOIR DIRE INSTRUCTION, ARGUMENT AND MOTION IN LIMINE."

Appellant asserts that he is aware that this Court has rejected these claims.[14] He requests that "he be allowed to fully brief" these points if "this Court has changed its position." This Court has not changed its position. Points of error five through nine are overruled.

The judgment of the trial court is affirmed.

Hervey, J.

Delivered: June 24, 2009
Publish

---

[14]

*See Busby v. State*, 253 S.W.3d 661, 667 (Tex.Cr.App.), *cert. denied*, 129 S.Ct. 625 (2008) (rejecting various constitutional challenges to Article 37.071 including the claim that it is unconstitutional because the mitigation special issue fails to place a burden of proof on the State) (point of error six); *Gallo v. State*, 239 S.W.3d 757, 780 (Tex.Cr.App.), *cert. denied*, 128 S.Ct. 2872 (2008) (execution-protocol claim not ripe for review on direct appeal because the defendant's execution is not imminent) (point of error five); *Roberts v. State*, 220 S.W.3d 521, 534 (Tex.Cr.App.), *cert. denied*, 128 S.Ct. 282 (2007) ("mitigating evidence" not constitutionally required to be defined more broadly than that evidence "which reduces a defendant's moral blameworthiness") (point of error nine); *Threadgill*, 146 S.W.3d at 671 (rejecting claim that Article 37.071 is unconstitutional for failing to require the jury to consider mitigation) (point of error seven); *Wood v. State*, 18 S.W.3d 642, 649 (Tex.Cr.App. 2000) (anti-parties special issue is constitutional because it specifically instructs the jury to consider the defendant's behavior alone) (point of error eight).