# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-23-00397-CR

---

**Bradley Russell Brown, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE 483RD DISTRICT COURT OF HAYS COUNTY**
**NO. CR-22-1459-B, THE HONORABLE TANNER NEIDHARDT, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

A jury found appellant Bradley Russell Brown guilty of two counts of aggravated sexual assault of a child (counts II and III) and one count of indecency with a child by sexual contact (count I). *See* Tex. Penal Code §§ 21.11(a)(1), 22.021(a)(1)(B), (2)(B). The jury assessed Brown's punishment at sixty years' confinement for counts II and III and twenty years' confinement for count I. The trial court sentenced Brown in accordance with the jury's verdict and ordered that the sentence for count III run consecutively to that imposed for counts I and II. *See* Tex. Code Crim. Proc. art. 42.08(a). In a single issue, Brown contends that the trial court erred by excluding from evidence text messages extracted from his cell phone. We affirm the trial court's judgments of conviction.

## BACKGROUND

On January 31, 2022, twelve-year-old Kelly Brunson[1] (Kelly) alleged that Brown, her biological father, had sexually assaulted her when she was around six years old. Kelly testified about the abuse at trial, describing two incidents at her paternal grandparents' house in Kyle, Texas, when she was "[f]ive through seven." She testified that during the incidents, Brown vaginally penetrated her with his penis and fingers and made her touch his penis with her hand.

Brown's trial strategy centered on the suggestion that Kelly was motivated to fabricate the allegations.[2] Specifically, Brown testified—and elicited testimony—that around the time of her outcry, Kelly was angry at him because she believed that he was attempting to move her grandparents into an assisted-living facility and because she feared being punished for using social media without her parents' permission.

Brown first questioned his ex-wife and Kelly's mother (Mother) about the content of text messages they exchanged. Brown and Mother divorced in 2013, when Kelly was four, and Brown was given primary custody of Kelly. Mother was allowed visitation and communicated with Brown "a lot" by text message "as parents." The custody order was modified after a contested hearing in 2019; Mother was given primary custody, and Brown was allowed visitation. Although Mother testified that she had communicated with Brown

---

[1] Because Kelly was a minor at the time of the offenses, we refer to her using a pseudonym in the interest of privacy. *See* Tex. R. App. P. 9.10(a)(3).

[2] Defense counsel never explicitly accused Kelly of fabrication but insinuated that she had been "infected" by those around her and advised the jury to consider the "context" in which her outcry was made.

"regarding concerns about [Kelly] using social media improperly," Mother testified that she did not remember the messages' "subject matter" or why she and Brown had texted one another.

Kelly, who was fourteen at the time of trial, testified that no one had told her to "make things up" or what to say and that she had not spoken with anyone in her family about her testimony. She testified that she was "very close" to her grandparents, who "basically raised" her. On cross-examination, she testified that she, Mother, Brown, and her grandparents had been in a group text and that Kelly and Brown had discussed "how [he] was wanting to get into [her grandparents'] house because he thought that they weren't mentally stable." She added that she had been worried that he "was going to try to take them and put them in assisted living . . . [b]ecause he was worried about their mental health and that they were sick and that [her grandmother] was sleeping all day long."[3] She further testified that her grandmother (Grandmother) had talked to her about Grandmother's "concerns with" Brown, that Kelly confronted him about Grandmother being stressed, and that Kelly was "mad about it."

Regarding her use of social media, Kelly testified that she was not allowed to use Facebook or Snapchat. She testified that while she had used them, she did not remember whether she had been using them around the time of her outcry. She also testified that her social media use was a "point of concern" for Mother, who texted Brown and Grandmother about it.

Grandmother was called as a witness by Brown and testified that she did not have any friends and had tried to treat Kelly like a friend. Grandmother testified that she had discussed many personal issues with Kelly.

---

[3] The trial court sustained the State's various objections to this and other testimony. However, the trial court gave no curative instruction, and the jury was not instructed to disregard the testimony.

3

Brown likewise testified about the group texts as well as those between him and Kelly. Kelly communicated that she was upset with how he was treating his parents. He had been concerned about their living conditions and his father's health, and Kelly had seen the poor conditions for herself. Kelly had been angry about her grandparents' "well-being."

Brown had prohibited Kelly from being on social media but had discovered a "Facebook profile[] with [Kelly's] picture and her name on it." When he questioned her about the account, Kelly "brought it up" to Mother. Brown had expressed his concern about Kelly's social media use in January 2022, shortly before her outcry. Moreover, Mother confronted Kelly the day of the outcry about having "made some mistakes."

Defense counsel informed the trial court of his intent to introduce through an expert thirty-six pages containing 638 text messages—spanning a period from October 21, 2020, through February 20, 2022—extracted from Brown's cell phone. At a hearing on the text messages' admissibility that was conducted outside the jury's presence, defense counsel acknowledged that the exhibit included messages from Grandmother, Kelly, Mother, and Brown but explained that they fell within an exception to the hearsay prohibition because they were "a present sense impression statement" and the expert's business record. Some of the messages, counsel proposed, would show that

> [Kelly] is stating that her father wants to take [her grandparents'] home away.
>
> We're not trying to admit those statements to prove that [either of Kelly's grandparents has] a diagnosis of Alzheimer or dementia. What we're trying to do is provide the jury what they deserve, context.
>
> This is such a traumatic event that happened so close to the outcry, ten days. I think it's totally reasonable to allow this in so the Court can see what was going on in the lives of Mr. Brown and [Kelly].
>
> . . . .

4

She was using Facebook but she shouldn't, or Snapchat. I think it's totally relevant to the jury to know that happened . . . . But I think what we want is the jury to see the totality of that, you know, and to really see the language. I think the language is powerful, to see a little girl attempt to deal with this tough issue with her father. And then you see her father try to explain it and her react in an immature way, and that's present in those text messages.

The hearing continued the following day, and defense counsel offered new bases for the messages' admissibility: (1) the State had "opened the door" by offering "the hearsay outcry," and the text messages were necessary under the Rule of Optional Completeness to prove not the truth of the matters asserted in them but rather "the relationship and the context in which those statements were made"; (2) the messages were admissible because they "describe[d] or explain[ed] an event or condition made at or immediately after . . . the declarant perceived it"; or, alternatively, (3) they were admissible for purposes of impeachment. *See* Tex. R. Evid. 107 (allowing adverse party to inquire into or introduce other parts of acts, declarations, conversations, writings, or recorded statements that are "necessary to explain or allow the trier of fact to fully understand the part offered by the opponent"); 803(1) (providing that near-contemporaneous statements "describing or explaining an event or condition" are not excluded by rule against hearsay); 806 (authorizing impeachment of declarant whose hearsay statement is admitted "by any evidence that would be admissible for those purposes if the declarant had testified as a witness").

After noting that defense counsel had not properly attempted to impeach a witness with the messages, the trial court concluded that defense counsel was offering them for the truth of the matters asserted and explained that "for all the reasons[:] the hearsay—the hearsay within hearsay, and I do a balancing test, the other arguments made by the State—it is Defense

5

Exhibit 1[4] and 2, in addition to being far more voluminous than they need to be, will—are not admissible."

The jury found Brown guilty of the charged offenses, and, following a hearing on punishment, the trial court sentenced him to the punishments assessed by the jury. This appeal followed.

## DISCUSSION

In a single issue, Brown contends that the trial court abused its discretion by "excluding text messages raising the issue of [Kelly's] motivation to raise [a] false accusation of abuse" because the text messages "were either non-hearsay, or met clearly established exceptions to the hearsay rule." Brown first argues that the messages were not hearsay because they were not offered to prove the truth of their contents but to show "the reasonable inferences which could have been drawn . . . related to [Kelly's] motive to fabricate her allegations against her father." *See id.* R. 801(d)(2) (defining "hearsay" as statement that "a party offers in evidence to prove the truth of the matter asserted in the statement"). Alternatively, he argues that the messages were admissible under the optional-completeness or then-existing mental condition exceptions to the hearsay prohibition.[5] *See id.* R. 107, 803(3). Brown also argues that the trial court's "Rule 403 ruling was an abus[e] of discretion in the absence of providing a reasonable opportunity to redact the phone records which should have otherwise been admissible." *See id.* R. 403.

---

[4] Defense Exhibit 1 was Brown's cell phone, the exclusion of which he does not challenge in this appeal.

[5] Brown acknowledges that defense counsel did not object under this exception, codified in Rule 803(3), at trial but states that it "is possible, if not probable that counsel misstated the applicable exception" when he argued for admissibility under Rule 803(1).

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016). An abuse of discretion does not occur unless the trial court acts "arbitrarily or unreasonably" or "without reference to any guiding rules and principles." *State v. Hill*, 499 S.W.3d 853, 865 (Tex. Crim. App. 2016) (quoting *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990)). In other words, we may not reverse the trial court's ruling unless the "decision falls outside the zone of reasonable disagreement." *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016). An evidentiary ruling will be upheld if it is correct on any theory of law applicable to the case. *Henley*, 493 S.W.3d at 93 (citing *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009)). We review the trial court's ruling by considering the record before the court "at the time the ruling was made." *Khoshayand v. State*, 179 S.W.3d 779, 784 (Tex. App.—Dallas 2005, no pet.).

"When a trial judge is presented with a proffer of evidence containing both admissible and inadmissible statements and the proponent of the evidence fails to segregate and specifically offer the admissible statements, the trial court may properly exclude all of the statements." *Willover v. State*, 70 S.W.3d 841, 847 (Tex. Crim. App. 2002). In properly segregating admissible statements in such mixed evidence, the proponent must specifically point out which statements are admissible and provide the "precise and proper application" of the rule or statute under which they are admissible "to the evidence in question." *Reyna v. State*, 168 S.W.3d 173, 179 (Tex. Crim. App. 2005); *Schulz v. State*, 446 S.W.2d 872, 874 (Tex. Crim. App. 1969).

A trial court "need never sort through challenged evidence in order to segregate the admissible from the excludable, nor is the trial court required to admit only the former part or

exclude only the latter part." *Jones v. State*, 843 S.W.2d 487, 492 (Tex. Crim. App. 1992), *abrogated on other grounds by Maxwell v. State*, 48 S.W.3d 196 (Tex. Crim. App. 2001), *overruled by Irby v. State*, 327 S.W.3d 138 (Tex. Crim. App. 2010); *see Whitaker v. State*, 286 S.W.3d 355, 369 (Tex. Crim. App. 2009) ("The trial court was not obligated to search through these audiotapes and remove all of the inadmissible references so that the recorded statements only contained the admissible evidence" (internal quotation marks omitted)). Rather, "[i]f evidence is offered and challenged which contains some of each, the trial court may safely admit it all or exclude it all, and the losing party, no matter who he is, will be made to suffer on appeal the consequences of his insufficiently specific offer or objection." *Jones*, 843 S.W.2d at 492.

Brown's proffered exhibit consisted of hundreds of text messages covering a period of a year and a half—thirty-six pages in total. Defense counsel offered conflicting assertions regarding which statements he sought to have admitted and shifting rationales as to why they were admissible. During the initial hearing, counsel accepted the trial court's characterization of the statements as hearsay but sought to have the entire exhibit admitted as a business record or under the present-sense-impression exception. When the trial court asked whether counsel was stating that "the 20 pages of cell phone records that you have are all present sense impressions and that's why they're exception[s] to the Hearsay Rule," counsel responded, "Well, it's also – it's also a business record."

The following day, counsel at first argued that the full exhibit was admissible under the Rule of Optional Completeness, as a present-sense impression, or for impeachment. Only when the court asked counsel to respond to the State's argument concerning the length and temporal range of the messages did counsel state:

8

> In essence, Judge, we're not asking the whole document to come in, we're only—we have the whole document to reflect that that was everything that was on the phone. We're only focusing in on really two days at or near the time of this offense.
>
> Again, it's to give context to what was going on on January 31st. There were messages on January 31st, 2022, and there were messages on January—the 21st and the 31st of 2022.
>
> . . . .
>
> And the witnesses were shown those text message[s] and they denied sending them or don't recall sending them.

Although seemingly arguing that all messages sent on those days were admissible to impeach Kelly or Mother, counsel elsewhere urged that the statements were not in fact hearsay:

> [W]e're not trying to use the statements to establish any truth from them, we're just trying to allow the jury to draw an inference from them, and for those reasons we believe in a limited sense the conversation from January 21st and in the same instance the 31st, should be admitted.

Moreover, it appears that counsel misidentified the dates in question. The texts on January 21, 2022, included a text from Kelly asking how Brown was doing as well as a brief exchange about an ankle injury suffered by Kelly. On the following day, the 22nd, Brown and Kelly exchanged forty texts spanning a number of topics, including: Kelly's grandparents' wellbeing and her grandfather's medical issues; the grandparents' potential criminal liability for various offenses; Brown's intention to move them into assisted living; his having been subjected by them to "years of mental, verbal, and physical abuse"; times at which Brown "slip[s] and get[s] triggered"; an individual named Ben, who appears to have been the grandparents' tenant;

9

and Brown's desire to have Kelly find a "good man" to "provide for [her] in every way" as Brown had.

The sixteen texts from the 31st included two texts from Mother regarding her finding a social media app on Kelly's cell phone. However, they also included texts from Brown in which he blamed Kelly's "rebellious" attitude on the music she was listening to, which he suggested would "lead[] her to believe sex, drugs, and that kind of lifestyle is [ac]ceptable/normal"; explained that he had spoken with Kelly "after every event like this one"; worried that social media use would lead to "onlyfans," "fooling around," and "a homerun and she[']s pregnant at 16"; disapproved of Kelly's having male friends; complained about the ineffectiveness of the "sex talk," which "didn[']t do much but open our minds to curiosities and fears"; and warned Mother against the influence of "subliminal advertising and subcon[s]cious programming through music, tv, and [Kelly's] friends that don[']t share similar interests."

The trial court could have reasonably concluded that defense counsel failed to identify exactly which text messages he sought to introduce and that counsel's proffer therefore at best included both admissible and inadmissible statements. *See Schulz*, 446 S.W.2d at 874; *Jones*, 843 S.W.2d at 492–93; *see also* Tex. R. Evid. 103(a)(2) (to claim error in ruling excluding evidence, party must inform court of its substance by offer of proof). Even assuming that the court understood Brown's offer as limited to all texts from January 22nd and 31st—which is by no means clear from the record, particularly in light of counsel's referencing the wrong day—the court could have reasonably concluded that many, if not most, of these texts were irrelevant or inadmissible hearsay. Such a conclusion would have been all the more reasonable given counsel's failure to offer the precise basis for admissibility for each proffered statement. *See Reyna*, 168 S.W.3d at 179. Nor would the trial court have been unreasonable in finding

10

counsel's sweeping, general, and shifting justifications insufficient. *Cf. Barnes v. State*, 876 S.W.2d 316, 329 (Tex. Crim. App. 1994) ("The trial court was not required, in the face of a global hearsay objection, to cull through the pen packet and exclude whatever particular matters he may find there that meet that description.").

Because the trial court could have reasonably concluded that defense counsel's proffer, insomuch as it could be delimited with any degree of specificity, contained inadmissible statements and because Brown did not segregate any admissible statements and explain precisely why each was admissible, the trial court did not abuse its discretion by excluding all of the offered statements. *See Willover*, 70 S.W.3d at 847. The court had no responsibility to search the messages and remove any inadmissible statements on Brown's behalf. *See Whitaker*, 286 S.W.3d at 369; *Jones*, 843 S.W.2d at 492–93.

Brown directs us to the Court of Criminal Appeals' decision in *Carey v. State* and argues that redaction is the proper remedy to separate admissible and inadmissible evidence. *See* 455 S.W.2d 217, 223 (Tex. Crim. App. 1970). That case, which involves the admissibility of confessions against codefendants under the Confrontation Clause, is inapposite. The only mention of redaction comes in a single sentence in a discussion of harm where the Court noted that the defendant, like Brown here, had not requested redaction. *See id.*

We conclude that the trial court did not abuse its discretion by excluding the proffered text messages on the basis that they included both admissible and inadmissible statements. *See Henley*, 493 S.W.3d at 82–83. We overrule Brown's issue.

**CONCLUSION**

Having overruled Brown's sole issue on appeal, we affirm the trial court's judgments of conviction.

_____
Maggie Ellis, Justice

Before Chief Justice Byrne, Justices Kelly and Ellis

Affirmed

Filed:   July 3, 2025

Do Not Publish