COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



|  | § |  |
|---|---|---|
| RONALD EUGENE REYNOLDS, | | No. 08-15-00374-CR |
| | § | |
| Appellant, | | Appeal from |
| | § | |
| v. | | County Court at Law No. 4 |
| | § | |
| THE STATE OF TEXAS, | | of Montgomery County, Texas |
| | § | |
| Appellee. | | (TC # 15-307890) |
| | § | |

## **O P I N I O N**

In a series of barratry cases, all tried together, a jury convicted Ronald Eugene Reynolds of five misdemeanor charges under TEX.PENAL CODE ANN. § 38.12(d)(West 2016). This appeal relates to the solicitation of George Sanchez, who was contacted within thirty-one days of a traffic accident in which he was involved, and signed up as Appellant's client. Appellant challenges the legal sufficiency of the evidence to support his conviction, the admission of extraneous offense evidence, and the venue in which this case was tried. We affirm.[1]

### **BARRATRY**

The offense of barratry, sometimes described as stirring up litigation, has been a crime in Texas since 1876. Katherine A. Laroe, Comment, *Much Ado About Barratry: State Regulation*

---

[1] This case was transferred to us by the Ninth Court of Appeals, and we apply its precedents to the extent they might conflict with our own. *See* TEX.R.APP.P. 41.3.

*of Attorneys' Targeted Direct-Mail Solicitation,* 25 St. Mary's L.J. 1513, 1519-20 n.28 (1994)(also tracing historical basis of offense through pre-colonial times). As far back as 1917, Texas outlawed a distinct form of barratry--use of a third party (a "runner") to solicit clients on behalf of a lawyer. *Id.* at 1524 n. 30. In a different form, that prohibition exists today in TEX.PENAL CODE ANN. §38.12(d)(West 2016) which criminalizes a lawyer knowingly permitting a third party to improperly solicit on the lawyer's behalf employment from a victim within thirty-one days of an accident.[2] Under the text of the statute, a lawyer commits an offense when he or she:

> (d)(2) with the intent to obtain professional employment for the person or for another, provides or knowingly permits to be provided to an individual who has not sought the person's employment, legal representation, advice, or care a written communication or a solicitation, including a solicitation in person or by telephone, that:
>
> (A) concerns an action for personal injury or wrongful death or otherwise relates to an accident or disaster involving the person to whom the communication or solicitation is provided or a relative of that person and that was provided before the 31st day after the date on which the accident or disaster occurred.

Stated otherwise: (1) a lawyer, (2) cannot with intent to obtain professional employment, (3) provide or *knowingly permit to be provided* to someone who hasn't sought the lawyer's services, (4) a written communication or a solicitation (in person or by phone), (5) in the first thirty days following some accident or disaster.

## FACTUAL SUMMARY

Robert Valdez, and his ex-wife, Crystal Valdez, ran a scheme that we can only hope is a rarity in personal injury litigation. Robert had Crystal scour the Houston Police Department's website for recent traffic accidents, and then obtain the corresponding police accident reports. The

---

[2] We parse the language only in relation to an attorney, but the Penal Code provision reaches other professionals as well. TEX. PENAL CODE ANN. § 38.12(d)(1)(West 2016)(application to any attorney, chiropractor, physician, surgeon, private investigator licensed to practice in this state, or any person licensed, certified, or registered by a Texas health care regulatory agency).

manner in which she did so allowed them to obtain the traffic accident report within two to three days of the accident. Robert believed this important so they could contact the not-at-fault driver before he or she signed with a lawyer. Crystal would then call the not-at-fault motorist to set up a meeting with Robert. He, or an associate, would then meet face-to-face with that person to sign them up with a lawyer. At the meeting, Robert had a blank attorney client contract for one of several law firms. He had a standing arrangement with those lawyers whereby they would pay him a set fee for each referral. Robert also directed the traffic accident victims to two injury clinics that he controlled, and to auto-body shops that paid him referral fees. Crystal would pull some 20-25 accident reports a day, leading to two follow up appointments a day.

These facts are not disputed in our record. What is disputed is whether Appellant was one of the attorneys to which referrals were made, and whether Appellant knew that five specific clients made the basis of the charged conduct here were solicited in this fashion.

The State learned of the Valdezes' scheme when Robert was in jail for an unrelated assault charge. Crystal, who claimed that Robert was abusive towards her, took that opportunity to contact the authorities and confess the scheme. Investigators from the Montgomery County District Attorney's Office, joined by the Texas Rangers, met Crystal at the Valdez residence in Montgomery County. They collected books and records that documented the hundreds of accident victims that had been referred to various lawyers. Robert soon pled guilty to barratry and agreed to testify against the several lawyers also charged. His testimony provided the following account of his scheme.

**Testimony of Robert Valdez**

After being released from the State prison in 2007 on drug charges, Robert found work as a truck driver. Through social and work contacts, he learned of persons involved in traffic

3

accidents and passed their phone numbers along to his brother. In return, Robert's brother would give Robert some small sum, such as gas money, for each phone number that he could provide. Robert claims to have averaged about five phone numbers per month.

In late 2007, a partner at Brown, Brown & Reynolds (BBR)--where Appellant was a named partner--set up a meeting with Robert. Appellant attended the meeting, but said nothing. The attorney offered Robert $200 for the phone number of each accident victim that he could provide. While this arrangement lasted, Robert continued to bring in about five numbers per month. During that time, the BBR attorney told Robert that if he ever needed a job, he could work at BBR. After Robert was laid off from his trucking firm in 2009 he took the firm up on the offer. He began working for BBR in various roles, and eventually as an investigator for the firm. As such, he continued to sign up clients and completed the usual paperwork attendant to that task, such as attorney-client fee agreements, intake questionnaires, and medical provider letters of protection. While at the firm, he was signing up forty clients per month. He also admitted to being paid under the table by chiropractors and body shops.

Valdez left BBR in 2011. Using his knowledge of personal injury litigation, he set up Greenspoint Health & Injury Clinic that provided physical therapy and chiropractic care. Around the same time, he began to experiment with pulling accident reports from the Houston Police Department website and contacting the not-at-fault party. He referred the persons to his own injury clinic, and developed a relationship with "West Loop Law" to whom he "sold" all prospective clients, some forty to forty-five a month. He claimed that two-thirds of these cases were from his personal associations and that one-third were from his use of police reports. When his partner at Greenspoint confronted him over the use of traffic accident reports to solicit patients, Robert opened a second clinic, Eastex Injury, with a different partner.

4

Robert claims that Appellant called him in February 2012 to set a meeting at Appellant's Westheimer office in Houston. This business was carried only under Appellant's name (Ronald E. Reynolds & Associates, PLLC.) and not BBR. At the meeting, Appellant expressed his desire to "purchase" clients. Robert initially declined because he was happy with his West Loop Law arrangement. But after Appellant pressed him, and based on their prior relationship, he agreed to sell clients on the same basis as his arrangement with West Loop Law: $800 for regular cases, $1,000 for policy limits cases, and $1,500 for collisions caused by commercial vehicles). Robert contends they agreed that Appellant would take three clients per week all to be delivered by Sunday with payment to be made in cash the next Friday. Robert would also take copies of Appellant's intake forms, including his fee contract, which he would complete with the prospective client.

Robert specifically testified that he went to Appellant's Westheimer office on March 1, 2013, a Friday, to collect money owed on a referred client. At that meeting, he picked up an envelope with $1000 in cash. The State partially corroborated this claim with security video footage showing Robert and Crystal entering and exiting the office suite. Appellant is seen leaving the office along with the Valdezes. Crystal testified that when they left, Robert gave her an envelope with a $1000 to count.[3]

The State documented Robert's barratry scheme through several exhibits. The State had recovered a log with some eight hundred names of accident victims that Robert solicited in the course of about a year. He could identify only one name on the list, but it matched to a client of Appellant. The State also recovered text messages from several of Robert's phones. One message

---

[3] In prior sworn testimony, she had claimed the sum was $10,000, but at trial explained that the larger sum was for the entire day's collections, and not just Appellant's office. Conversely, Appellant testified that he gave Robert $200 that day, which was for investigative services, and specifically for completing the attorney fee agreement and personal injury questionnaires for four clients at $50 per packet--the same amount he was paid for that work while he was with BBR.

5

from Appellant read, "Robert, I've been trying to talk to you. The last case is no good. The insurance company ACC denied the claim." Another text states that Robert needed to come by to "pick up some love", which was his code word for collecting a payment. Yet another message asks what is a good time for a "2 kitty pick up" which was a code word for clients. A text message stating "got you three in the a.m." according to Robert, referred to three client referrals.

## Client File Evidence

When Crystal allowed investigators to search Robert's home office, they discovered a blank fee contract under Appellant's letterhead. They also found files set up under the names George Sanchez, Kalisha Keller, Carolina Castelan, Jose and Destiny Trevino, Kuh Taw, and Juan Navejar Jr. Each of these files contained a fee agreement, under Appellant's letterhead, signed by the respective client. The files also contained a "Personal Injury Questionnaire," again under Appellant's letterhead, with various blanks filled in describing the accident, the injuries, and providing contact information. Some files also had executed medical releases, medical provider letters of protection signed by the client, and each had traffic accident reports. When the State executed a search warrant at Appellant's law office, these very same documents were found in his client files for each of the same persons.

## The Charged Offense

This appeal arises out of a complaint charging Appellant with providing, or knowingly permitting to be provided, a solicitation for a personal injury action to George Sanchez within thirty days of his traffic accident, all with the intent to obtain professional employment. Sanchez was involved in a motor vehicle accident on February 10, 2012. He was contacted by a women who said she was authorized by the insurance company, and who set up a meeting with Sanchez. The woman came by the same day with paperwork to sign, which included Appellant's fee

6

contract. She referred him to a clinic and also left Appellant's business card. Sanchez is noted in one of Crystal Valdez's ledgers as a client she signed up. From both Valdez's and Appellant's files, the State admitted a signed fee contract and personal injury questionnaire, dated February 15, 2012 (five days post-accident).

Sanchez did not know if his claim had ever been settled. He had never had a conversation with Appellant. He received a payment for his property damage directly from an insurance carrier.

The State tried this complaint along with four additional complaints alleging the same conduct, but for different traffic accident victims. For each of the four other persons--Kuh Taw, Kalisha Keller, Carolina Castelan, and Jose Trevino--the State admitted evidence that each was contacted within thirty days of their accident and that fee agreements with Appellant's office were then executed. None of these persons had requested to be contacted. Robert testified that Appellant paid him for each of these clients.

## Appellant's Response

Part of Appellant's tactic at trial was to attack the credibility of Robert Valdez who has several past felony convictions, and entered into a plea arrangement reducing his potential barratry sentence from life imprisonment to five years.[4] Appellant also challenged Valdez's claim that his employment with BBR had anything to do with soliciting cases. Instead, BBR represented Valdez's son in a personal injury case. A case investigator working up that case recommended Valdez as a potential hire because of his Spanish language skills. The firm also had a connection with the Valdez family, having represented Valdez's brother and mother in non-solicited cases. Valdez's own brother testified that he never paid Robert for collecting phone numbers, or that he took referral fees from the firm.

---

[4] Because of his prior convictions, Valdez was a facing a 25 year to life sentence on his own barratry charge. Under his plea agreement, he received a five-year sentence.

7

While Robert was working for BBR, he completed the firm's standard initial paperwork for prospective clients who had legitimately come to the firm. He was paid $50 per sign up (for gas), and was trained on having prospective clients execute attorney-client fee agreements and other initial paperwork. After he left the firm, he still performed some occasional errands. But Appellant was aware that Valdez had opened two of his own injury clinics, and had connections to several more. Appellant claimed that any referrals he obtained through Valdez were from persons who had legitimately gone to those clinics and requested lawyer assistance. Valdez was trained at BBR in completing fee contracts and client questionnaires, and thus continued to complete these documents after he left the firm.

Valdez did not begin to use accident reports to identify prospective clients until after he left BBR. Even at that, most of Valdez's referrals were not solicited through accident reports. Valdez himself conceded that he never directly informed Appellant that the referred cases had been solicited. Appellant specifically denied that he was aware that any of the five listed auto accident victims had been illegally solicited. His assumption was that all these people were walk-ins to clinics that needed an attorney.

Based on the foregoing evidence, and some additional testimony we discuss below, the jury convicted Appellant on each of the five complaints. He was sentenced to one year in jail on each charge, in addition to a $4,000 fine. This appeal follows.

## SUFFICIENCY OF THE EVIDENCE

In his first issue, Appellant challenges the sufficiency of the evidence to support his conviction. We begin with our standard of review.

**Standard of Review**

Evidence is legally sufficient when, viewed in the light most favorable to the verdict, a rational juror could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788-89, 61 L.Ed.2d 560 (1979); *Brooks v. State*, 323 S.W.3d 893, 912 (Tex.Crim.App. 2010)(establishing legal insufficiency under *Jackson v. Virginia* as the only standard for review of the evidence).

The jury is the sole judge of credibility and the weight attached to the testimony of each witness. *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex.Crim.App. 2014). It is the fact finder's duty "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex.Crim.App. 2007), *quoting Jackson*, 443 U.S. at 319, 99 S.Ct. 2781. The jury also may choose to believe or disbelieve that testimony. *Lancon v. State*, 253 S.W.3d 699, 707 (Tex.Crim.App. 2008); *Belton v. State*, 900 S.W.2d 886, 897 (Tex.App.--El Paso 1995, pet. ref'd). When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict, and we defer to that determination. *Dobbs*, 434 S.W.3d at 170; *see also Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789.

Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone may be sufficient to establish guilt. *Dobbs*, 434 S.W.3d at 170; *Carrizales v. State*, 414 S.W.3d 737, 742 n.20 (Tex.Crim.App. 2013), *citing Hooper v. State*, 214 S.W.3d 9, 13 (Tex.Crim.App. 2007). Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Dobbs*, 434 S.W.3d at 170; *Hooper*, 214 S.W.3d at 13.

"Under this standard, evidence may be legally insufficient when the record contains either no evidence of an essential element, merely a modicum of evidence of one element, or if it conclusively establishes a reasonable doubt." *Britain v. State*, 412 S.W.3d 518, 520 (Tex.Crim.App. 2013), *citing Jackson*, 443 U.S. at 320. We remain mindful that "[t]here is no higher burden of proof in any trial, criminal or civil, and there is no higher standard of appellate review than the standard mandated by *Jackson*." *Brooks*, 323 S.W.3d at 917 (Cochran, J., concurring). Nonetheless, if a rational fact finder could have found the defendant guilty, we will not disturb the verdict on appeal. *Fernandez v. State*, 479 S.W.3d 835, 838 (Tex.Crim.App. 2016).

**Analysis**

The only serious question raised in the sufficiency challenge is whether Appellant knowingly permitted Robert or his associates to contact accident victims who had not first sought his advice about legal representation within thirty days of the accident. To be more precise, the date when the persons were contacted is not in question: the Personal Injury Questionnaires completed by Robert or his agents and sent to Appellant reveal that each client was contacted within the first thirty-days following the accident.[5] Whether Appellant knew how Robert came upon those people, and permitted him to do so, is the relevant question. A person acts with knowledge when he or she is aware that the circumstances exist. TEX.PENAL CODE ANN. § 6.03(b)(West 2011); *Nowlin v. State*, 473 S.W.3d 312, 318 (Tex.Crim.App. 2015).

Appellant suggests that Robert's connection with two injury clinics provides a reasonable explanation as to how the five clients could have legitimately encountered Valdez. While at a

---

[5] George Sanchez's accident was on February 10, 2012 and his questionnaire was completed five days later on February 15, 2012. Kalisha Keller's accident was on February 8, 2012 and her questionnaire is dated February 14, 2012. Kuh Taw's accident was on February 15, 2012 and the questionnaire is dated February 22, 2012. Jose Trevino's accident occurred March 5, 2012 and the questionnaire is dated March 15, 2012. Carolyn Castelan's accident was on March 18, 2012 and her questionnaire is dated March 21, 2012. All of these dates were manifested in documents contained in Appellant's files.

10

medical clinic, patients might well ask for, and properly be given, an attorney recommendation. Robert himself had previously recommended family and friends to the BBR firm. Appellant thus claims the State has failed to show that he knowingly permitted Robert to run his scheme, particularly since he never directly told Appellant how he would generate the three client referrals per week. Nonetheless, a rational jury could have found that the source of referrals here was neither innocent nor appropriate.

First, the jury heard evidence that the referrals were inappropriately paid for. The State called attorney Charles Herring as an expert. He testified to the "law of lawyering" which included an explanation of the barratry statute and the appropriate manner in which an attorney can secure clients. Attorneys can indeed use third parties to help develop business, but only within the parameters of the State Bar rules. Herring provided the example of a television ad or website approved by State Bar, both of which involve an attorney using a third party vendor. Nonetheless, lawyers cannot directly approach a person in the first thirty days (other than family members or existing clients), and consequently, a lawyer cannot have someone else do the same for them, even if the person is uncompensated. By adding the fact of payment, outside of approved marketing activities, the lawyer engages in "classic case running." Appellant counters that even if the jury believed that he purchased clients, that fact does not indicate that he knew they were improperly contacted. While we agree it is not direct evidence of such, knowing that Robert was improperly selling clients would be a circumstance the jury could consider in the context of the other evidence of guilt.

Second, the payments here were required to be paid in cash. When Appellant paid the medical bills at the conclusion of a case, the payments were appropriately documented through a check. The documented payment allows the attorney to justify deductions from the total settlement

sum for legitimate case expenses. By contrast, Appellant for the most part paid Robert in cash.[6] No payments were documented on any kind of client ledger in Appellant's files as legitimate case expense. Added to this, the text messages used set up pick-ups used coded language, such as "pick up some love" or "2 Kitty pick up" that the jury could consider in deciding if the parties had nefarious motives.

Third, the treatment dates for each of the five clients belie any claim that they were referred to Appellant only after first coming into contact with Robert through his injury clinics. Instead, the treatment dates show that Robert contacted the victims *before* their initial medical treatment, suggesting that the contact was more likely used to refer the patients to both the clinic and Appellant. Kuh Taw, for instance was involved in his traffic accident on February 15, 2012. Robert or his associate met with Mr. Taw on February 22, 2012. The questionnaire reflects that Taw would treat at "Greenspoint," which is a Valdez controlled clinic. But the initial evaluation at that clinic is dated March 15, 2012, more than three weeks after he was signed up by Robert. The dates of the sign up and treatment would all be apparent to Appellant, as the medical reports and bills were part of his file. We have carefully reviewed each of the client files from the other Complaints and similarly note with one exception that the first date of treatment was always after the date the person was signed up as a client.[7]

---

[6] Appellant did introduce several checks from 2011 payable to Valdez from "The Brown & Brown Law Firm, P.C." for investigative services, travel or supply reimbursement, or an advance. These checks, however, predate the barratry arrangement between Appellant and Valdez.

[7] George Sanchez signed a fee agreement on February 15, 2012, but his first date of treatment was not until seven days later. Carolina Castelan signed her fee agreement on March 21, 2012, but her initial exam at Greenspoint was not until March 27, 2012. Jose Trevino was signed up on March 15, 2012, but he was not seen at Fields Chiropractic Clinic until March 19, 2012. The lone exception was Kalisha Keller, who on her own went to Doctor's Hospital on the date of her accident, but nothing in the record suggests that hospital is associated with Robert Valdez, or that the staff there had anything to do with the referral to Appellant. Instead, Robert signed her with Appellant a week after the accident and she was then seen two weeks after the accident at a clinic associated with Robert. These dates would all be apparent to Appellant as they came out of his own client files.

Fourth, the jury could infer Appellant's knowledge of Robert's improper solicitation from a time gap when Appellant stopped taking referrals. Each of the five clients associated with the five Complaints were referred to Appellant in February and March 2012. In April 2012, a Harris County District Attorney and investigator unexpectedly visited Appellant about a separate barratry investigation involving another third party runner. They confronted Appellant about allegations of using this person as a runner. Appellant denied the charge, claiming instead the other person was a marketer who worked through several chiropractic clinics. Nonetheless, Appellant was subsequently charged with barratry in Harris County. The charges were dropped in February 2013 because the investigator was himself charged with some criminal conduct. The State elicited this evidence to show that Appellant stopped taking referrals from Robert Valdez beginning in April 2012 while the Harris County investigation was pending, but again started taking referrals once the Harris County charges against Appellant were dropped.[8] A jury could consider this circumstantial evidence in considering whether Appellant had knowledge that Valdez was improperly soliciting clients. Stated otherwise, if he really believed that all of Valdez's referrals were from patient-initiated contacts, why would he have refused them if they could withstand police scrutiny?

Fifth, the redaction of Valdez's name on some of Appellant's file documents could raise an inference that Appellant was attempting to hide something. The Personal Injury Questionnaires for George Sanchez, Kalisha Keller, Carolina Castelan, and Jose Trevino in Appellant's files originally contained the handwritten notation "Robert" in a "referred by" blank on the form. The

---

[8] A text message on January 28, 2013 from Valdez to Appellant states "Okay. Like to speak to you on further cases. Thank you. Robert." Appellant responds, "Excellent." The State then admitted a subsequently referred file for Juan Navejar, Jr. dated February 6, 2013 (from an accident four days earlier). The State also pointed out that Appellant had changed his fee agreement in the interim to contain an express disclaimer that the client had not been solicited ("Client has willingly and freely chosen Attorney to represent Client, without solicitation, undue influence, barratry or other improper encouragement.").

references to "Robert", however, were "whited out" with liquid paper. The jury was asked to inspect the original document where the handwritten word "Robert" is still visible by looking at the back of the page. The inference raised, a fair one we think, is that someone within Appellant's office whited out the reference to a referral by Robert on four of the five questionnaires. Appellant's legal assistant could provide only a *non sequitur* explanation for why she would have whited out Valdez's name.[9] Attempts to conceal incriminating evidence, (along with inconsistent statements and implausible explanations) are probative of wrongful conduct and are circumstances of guilt. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex.Crim.App. 2004); *Louis v. State*, 159 S.W.3d 236, 247 (Tex.App.--Beaumont 2005, pet. ref'd).[10]

Sixth, the jury could doubt the legitimacy of the referral based on the paperwork itself. Appellant's legal assistant testified that when clinics referred patients, the *usual* procedure was for the patient to call to Appellant's office. Once they did so, a contract employee would then be dispatched to sign the patient up. On some occasions, the legal assistant might receive a call from the clinic while the patient was still there, and she would send the fee agreement to the clinic and answer any questions the patient may have had. In each of the five complaints at issue here, however, without receiving any preliminary phone call, Appellant's office received a completed

---

[9] She testified "That I would whiteout sometimes if they -- I would assume that because they were -- came from [Valdez's] clinic that they were referred by him, but if they stated they were referred by another client or their friend, their cousin, then I would white it out." None of her activity logs, however, reflect that she had any discussions with the clients noting that someone else referred them, and even if so, no new name of another referral source was entered onto the form.

[10] The State also claimed that Appellant had in fact first made the notation "Robert" on the forms and urged the jury to compare the handwritten "Robert" to Appellant's writing (which distinctly slants one direction because he is left-handed) and that of his legal assistant (which is itself distinctive). Under the Code of Criminal Procedure, a jury is competent to make a handwriting comparison unless the witness denies a signature under oath. TEX.CODE CRIM.PROC.ANN. art 38.27(West 2005). Appellant denied that two of the whited out signatures were his. He admitted that one was his, and stated he did not know about the fourth. For at least two of the signatures, the record contains some evidence that Appellant made the entry that Robert generated the referral.

14

fee agreement, a copy of a traffic accident report, a completed personal injury questionnaire, and either an executed letter of protection or medical release, with the provider left blank.

Appellant emphasizes that no "parties" charge was given here, and the jury could not therefore impute the actions of Valdez to Appellant. Under the barratry statute, however, Appellant was charged for knowingly permitting Valdez to solicit the prospective client on his behalf. Knowingly permitting a third person to engage in proscribed conduct is itself an element of the crime, and consequently no parties charge is required to allow the jury to consider that third party's conduct. Appellant also cites us to a number of cases in support of his argument that the evidence is insufficient. We have read the cases and find them to be distinguishable. None involve a conviction for barratry and in each of the cases cited, the State failed to present any evidence of some element.

The evidence here supports a rational construct that Appellant was aware of Valdez's scheme and knowingly permitted his conduct. He actually promoted Valdez's conduct by providing him the forms used to solicit the clients, and then paying him for doing so. We conclude that a rational jury, considering all the evidence together, could have concluded beyond a reasonable doubt that Appellant knowingly permitted Valdez or his agents to provide a solicitation to George Sanchez within thirty days of his accident. We accordingly overrule issue one.

## EXTRANEOUS OFFENSE EVIDENCE

In his second issue, Appellant attacks the trial court's decision to allow testimony regarding two extraneous bad acts. The first extraneous act involved one client's claim that her case was settled without her authority, with the settlement agreement actually being signed by Appellant. The second extraneous act involves the earlier Harris County barratry investigation.

15

**Standard of Review**

A trial court may allow evidence of an extraneous offense if it (1) is relevant to a material, non-character conformity issue, and (2) the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex.Crim.App. 2009). The first requirement follows from TEX.R.EVID 404(b) and the second from Rule 403. We review the admission of extraneous-offense evidence under Rule 404(b) for an abuse of discretion. *Id*. at 343; *Knight v. State*, 457 S.W.3d 192, 201 (Tex.App.--El Paso 2015, pet. ref'd). We also review a trial court's ruling under Rule 403 for an abuse of discretion. *Pawlak v. State*, 420 S.W.3d 807, 810 (Tex.Crim.App. 2013); *see also Montgomery v. State*, 810 S.W.2d 372, 391 (Tex.Crim.App. 1990)(op. on reh'g). We will not overturn the trial court's ruling unless it is so clearly wrong as to lie outside the zone of reasonable disagreement. *Taylor v. State*, 268 S.W.3d 571, 579 (Tex.Crim.App. 2008); *Montgomery,* 810 S.W.2d at 391. Nor may we substitute our own decision for that of the trial court. *Moses v. State*, 105 S.W.3d 622, 627 (Tex.Crim.App. 2003).

**Relevance and Evidence of Bad Acts**

In deciding whether a particular piece of evidence is relevant, a trial court judge should ask "would a reasonable person, with some experience in the real world believe that the particular piece of evidence is helpful in determining the truth or falsity of any fact that is of consequence to the lawsuit." *Montgomery*, 810 S.W.2d at 376, *quoting United States v. Brashier,* 548 F.2d 1315, 1325 (9th Cir.1976). If the trial court believes that a reasonable juror would conclude that the evidence alters the probabilities of contested events to any degree, the evidence is relevant. *Id*. Relevant evidence is generally admissible, while that which is not, is not. TEX.R.EVID. 402.

In criminal cases, we are also guided by Rule 404(b)(1) which commands that evidence of other crimes or bad acts is not admissible to show character conformity. TEX.R.EVID. 404(b)(1). The origin of the prohibition is not based on the notion that "character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge." *Michelson v. United States*, 335 U.S. 469, 475-76, 69 S.Ct. 213, 218, 93 L.Ed. 168 (1948)(footnote omitted). Nevertheless, that kind of evidence might be admissible for some other non-character-conformity purpose, such as showing motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. TEX.R.EVID. 404(b)(1).

## Rule 403 Balancing

Relevant evidence is generally admissible, but it is properly excluded under Rule 403 when its probative value is substantially outweighed by the danger of unfair prejudice. TEX.R.EVID. 403; *Casey v. State*, 215 S.W.3d 870, 879 (Tex.Crim.App. 2007). "Virtually all evidence that a party offers will be prejudicial to the opponent's case, or the party would not offer it. Evidence is unfairly prejudicial only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justifies its admission into evidence." [Citations omitted]. *Id.* at 883.

In conducting a Rule 403 balancing test, the trial court must consider (1) the inherent probative value of the evidence and (2) the State's need for that evidence against (3) any tendency of the evidence to suggest a decision on an improper basis, such as emotion, (4) any tendency to confuse or distract the jury from the main issues, (5) any tendency to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or be

needlessly cumulative. *Gigliobianco v. State*, 210 S.W.3d 637, 641-42 (Tex.Crim.App. 2006) (noting these factors as a refinement to a four factor test appearing in prior cases). In practice, these factors may well blend together. *Id.* Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence is more probative that prejudicial. *Martinez v. State*, 327 S.W.3d 727, 737 (Tex.Crim.App. 2010). We should reverse a trial court's ruling under Rule 403 "rarely and only after a clear abuse of discretion." *Montgomery,* 810 S.W.2d at 392, *quoting United States v. Maggitt,* 784 F.2d 590, 597 (5th Cir. 1986).

### The Castelan Settlement

Based on Appellant's paper file, Carolyn Castelan routinely settled her claim with an insurance company for $3,500.00. When she testified at trial, however, the State alerted the trial judge that she did not authorize the settlement and would testify that the signature on the release was forged. Appellant lodged objections under Rules 401, 403 and 404. The trial court initially ruled that Castelan could testify that the case was settled without her consent, but that the State should stay away from any claim of forgery.

Based on that ruling, Castelan then testified that she learned of the negotiated settlement only when she received a letter from the insurance company. She claimed she never pre-authorized the amount, but she ended up cashing the check representing her share of the settlement after payment of medical and legal expenses. When Appellant later took the stand, he denied that her case was settled without her consent. The State, contending that Appellant opened the door, then admitted the release agreement that was signed by Appellant on her behalf. Appellant testified that his legal assistant assured him that Castelan had given him permission to do so.

18

**a) Error Analysis**

The State contends that testimony about how the case was concluded is relevant "contextual" evidence to explain Appellant's intent to obtain professional employment. We would agree that the fact Appellant pursued claims of behalf of the several clients is relevant to his intent to actually engage each of these persons as clients. That evidence might include the demand letters sent on the client's behalf, and the eventual conclusion of the cases through settlement. We are less sure, however, of the relevance of whether any particular client was satisfied with the settlement or not, or the mechanics of how the settlement paperwork was executed. Nor does a dispute about whether Appellant was authorized to sign a release by the client add any context to his intention to engage in professional employment. At a minimum, applying the *Gigliobianco* factors, its marginal relevance is substantially outweighed by the danger of unfair prejudice. We conclude that admission of the signed settlement agreement and testimony about whether the settlement amount was pre-authorized should have been excluded.

**b) Harm Analysis**

Any error, other than constitutional error, that does not affect the substantial rights of the accused must be disregarded. TEX.R.APP.P. 44.2(b). A substantial right is affected when the error had "a substantial and injurious effect or influence in determining the jury's verdict." *Whitaker v. State*, 286 S.W.3d 355, 363 (Tex.Crim.App. 2009), *quoting King v. State*, 953 S.W.2d 266, 271 (Tex.Crim.App. 1997). If the error had no influence, or only a slight influence on the verdict, it is harmless. *Whitaker,* 286 S.W.3d at 362-63. In making this assessment, we examine everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the error and how it relates to the other evidence in the case, the theory of the prosecution and defense, the jury instructions, the

19

closing arguments, and whether the state emphasized the error. *Barshaw v. State*, 342 S.W.3d 91, 94 (Tex.Crim.App. 2011).

Based on this record, we conclude the error is not harmful. Although Appellant refers to the issue as one of forgery, the word forgery was not used before the jury, either during the testimony or during closing argument. The evidence relates to disputed discussions between the client and the legal assistant with whom she communicated. And while a dispute of that nature is far from flattering to an attorney, it was not an issue that predominated at trial. The disputed testimony covers only a few pages of the weeklong trial (totaling some 1100 pages of testimony). The issue with Ms. Castelan garnered only two lines in the State's closing statement. Moreover, it would be considered in light of other evidence showing some of Appellant's clients were satisfied with his representation. Other clients testified that the first time they had talked to him was when he cross-examined them at trial.[11] Even at that, Ms. Castelan cashed the check tendered her and ultimately ratified the settlement that was reached: the issue at best questioned the mechanics of the closing settlement paperwork.[12] We cannot conclude this one client's complaint with her legal representation turned the scales in this case.

### The Harris County Investigation

The State also introduced evidence of a 2012 Harris County investigation of Appellant for barratry through a different third party runner. The State alerted the trial court that it would introduce the evidence through the testimony of the Harris County prosecutor who investigated the case; the trial court was provided a taped interview she conducted of Appellant. As a basis for

---

[11] Appellant acted as his own lead attorney and conducted all the cross-examinations of his former clients.

[12] Appellant's brief refers to a forged settlement check, but there was no indication the endorsement on any check was forged. The question was whether Appellant was authorized to sign the release with the permission of Ms. Castelan. Of perhaps more significance, the prosecutor suggested in closing that Appellant had failed to pursue claims on behalf of Ms. Castelan's child who was in the car at the time of the accident, and who had some pre-existing condition exacerbated by the collision. Appellant raised no objection to that matter, however.

20

admission of the evidence, the State claimed that Appellant stopped taking cases from Valdez after the interview, and then began taking cases again only after the Harris County charges were dropped. After the trial court reviewed the taped interview (which itself was never admitted), the court indicated its intention to allow the State to admit the testimony for the limited purpose of showing knowledge, common scheme, and credibility. The court's ruling came with a proviso that the evidence needed to be to "the point, short, concise."

The issue first came up, however, during Appellant's testimony in his case-in-chief. Appellant testified on direct examination that he had never paid a referral fee for a case. On cross-examination, the State then asked him whether he took cases from the third party at the center of the Harris County investigation. Appellant objected on relevance. The trial court allowed the question, but gave a limiting instruction. Appellant then responded that he paid that person's firm $10,000 a month for marketing and advertising services. He acknowledged that he was interviewed on April 19, 2012, by a prosecutor investigating barratry charges. He agreed that the marketer would bring him completed intake forms and attorney contracts for new clients.

On re-direct, Appellant developed that the Harris County investigation began when an investigator named Lonnie Blevins accompanied a complaining witness to chiropractic clinic. The complaining witness stated that she was not hurt, but was given Appellant's fee contract to sign (he testified he refused the referral). Appellant then testified that he was later arrested for barratry, but the charges were dismissed because they were "frivolous" and the investigator was a "dirty cop" who was eventually sent to prison. He admitted to making the monthly $10,000 payments, but claimed they were for legitimate marketing and case investigations services. Appellant testified that he stopped taking cases altogether from April 2012 to February 2013.

21

In rebuttal, the State called Wendy Baker, the Harris County prosecutor. She interviewed Appellant on April 19, 2012, after her office had executed a search warrant at a chiropractor's office and found Appellant's blank attorney client fee agreements at the office's front desk, as well as executed fee agreements in several patient files.[13] During Appellant's interview with Ms. Baker, he admitted that his completed fee contracts would appear on his fax machine one to three times a day. Perhaps the most damaging part of her testimony came in Appellant's own cross-examination of Ms. Baker:

> [APPELLANT]: Wendy, you don't have any evidence -- isn't it true that you don't have any evidence that I had actual knowledge of how [the marketer] and [the chiropractor] got [the complaining witness] to be a client at the clinic, do you?
>
> [WITNESS]: I know what you told me.
>
> [APPELLANT]: Okay. And -- but you don't know that -- you don't know how [the chiropractor] came to meet her, do you?
>
> [WITNESS]: I know what you told me.
>
> [APPELLANT]: Okay. And what did I tell you?
>
> [WITNESS]: That they set up case running for other doc- -- other lawyers and other doctors --

**a) Preservation**

"To preserve error, a complaining party must make a timely and specific request, objection, or motion and obtain an express or implied ruling on that request, objection, or motion." *Lopez v. State*, 253 S.W.3d 680, 684 (Tex.Crim.App. 2008). An objection must be made each time inadmissible evidence is offered unless the complaining party obtains either a running objection or a ruling on the complaint in a hearing outside the presence of the jury. *Id*. Here, Appellant

---

[13] The search warrant was issued following a sting operation where the complaining witness went into a chiropractic clinic. The clipboard of papers initially given her to fill out included Appellant's attorney client contract. She told the chiropractor during her exam that she was not in any pain. He responded, "Let me be the judge of that" and then proceed to twist her arm until it hurt. He then had her come in two or three times a week.

22

prompted a hearing and the trial court, after considering the Rule 401, 404(b) and 403 arguments, indicated her intent to allow the testimony in a focused and limited way.

Our concern with error preservation, which we are required to consider even when not urged by the parties, is that Appellant admitted *some* of the more salacious details of the earlier investigation. He introduced the initial details of the sting operation and the fact that he was arrested. It is not clear that the State would have ever included those matters had Appellant not first admitted them. Accordingly, in passing on this issue, we decline to consider the fact of Appellant's arrest and the initial details of the sting operation, because Appellant unilaterally first admitted that evidence. We consider everything else, however, in our analysis.

**b) The Evidence is Relevant to a Non-Character Conforming Issue**

The evidence is relevant for at least two reasons. First, Appellant adamantly claimed through his own testimony, and through his other witnesses, that he never paid a referral fee. The evidence at issue challenged that claim. While Appellant contends the $10,000 per month was for legitimate marketing and case investigation services, the jury could have concluded otherwise with the guidance of the State's expert who addressed what might be proper marketing activities through third parties. Correcting a misconception created by a defendant's blanket assertion is a legitimate non-character conformity purpose under Rule 404(b). *Daggett v. State*, 187 S.W.3d 444, 452 (Tex.Crim.App. 2005)(defendant's testimony that "I would never have sex with a minor" would have opened door to other extraneous if trial court had properly worded limiting instruction); *Prescott v. State*, 744 S.W.2d 128, 130 (Tex.Crim.App. 1988)(defendant's testimony that it was his "first time going through this" opened door to admission of prior criminal history); *Garcia v. State*, 454 S.W.2d 400, 406 (Tex.Crim.App. 1970) (defendant's claim that he was an inexperienced fighter permitted prosecutor to admit evidence of previous fights); *Straker v. State*,

08-14-00112-CR, 2016 WL 5845825, at *24 (Tex.App.--El Paso Sept. 30, 2016, no pet.)(not designated for publication)(witness's statement that defendant did not appear under the influence opened door to inquiries as to when she had seen him under the influence).

The evidence also establishes a time line for when Appellant stopped and then again started taking referrals from Valdez. He stopped taking referrals after he was interviewed about the Harris County matter, and then started again when that investigation concluded. When he resumed taking referrals from Valdez, his new fee contract contained an express disclaimer that the putative client had not been solicited. "Knowledge" was one of the limiting purposes used by the trial court, and one expressly included in Rule 404(b). *See Knight v. State*, 457 S.W.3d 192, 203 (Tex.App.--El Paso 2015, pet. ref'd).

We find Appellant's arguments to the contrary unavailing. He argues the Houston investigation was focused on barratry under Section 38.12(a) and (b)(which criminalizes payment of referral fees for directly soliciting clients) while the charge here is limited to providing solicitations within the first thirty days of an accident. Yet the purpose for which the evidence was offered--rebutting Appellant's own testimony, and showing knowledge of Robert's wrongdoing-- makes that distinction of no consequence.

Appellant also claims the Harris County case was too far afield of the facts here. While there were differences in the two barratry schemes, there were also similarities. In both, Appellant was receiving executed fee agreements that the third parties had presented to the prospective clients. Both involved accidents with treatment through chiropractic injury clinics. Both involved payments that Appellant claimed were in part for investigative services to the third party. The situations were at least sufficiently similar that a jury could conclude Appellant's decision to

24

temporarily stop taking cases from Valdez was because the authorities were investigating illegal barratry schemes, and Valdez's scheme fell into that category.[14]

Appellant also claims that the evidence regarding the Harris County investigation was inadequate to prove the claim beyond a reasonable doubt. The trial court made a preliminary determination from Appellant's recorded interview with Ms. Baker that the evidence could meet that threshold. *See Harrell v. State*, 884 S.W.2d 154, 161 (Tex.Crim.App. 1994)(noting beyond reasonable doubt as standard); *Montgomery*, 810 S.W.2d at 389 (noting procedure for hearing 404 challenge). The recorded interview actually contains more information than that presented at trial, and we conclude the trial court did not abuse its discretion in determining that the testimony could meet the beyond a reasonable doubt standard. The trial court's determination of relevance was therefore in the zone of reasonable dispute.

### c) Rule 403

Nor do we agree that the trial court erred in rejecting a Rule 403 challenge. The evidence was probative and necessary. The State was required to show that Appellant understood that Valdez improperly contacted prospective clients within the first days of an accident. Appellant's own files showed the date of contact, but the State needed to dispel the claim that these persons were legitimately coming to Valdez first. The fact that he stopped taking Valdez's referrals when he knew the Harris County authorities were focused on his law practice demonstrated that he doubted that Valdez was legitimately obtaining client referrals. The "probative value" of evidence means more than simply relevance. *Gigliobianco*, 210 S.W.3d at 641. Rather, it refers to how

---

[14] We might agree that the testimony was not relevant to the "plan" exception of Rule 404(b) because there was no direct interconnection between the two runners, the clinics they ran cases through, or even their manner of soliciting patients. See *Daggett v. State*, 187 S.W.3d 444, 451 (Tex.Crim.App. 2005)("Unfortunately, courts frequently admit evidence of extraneous acts under [the plan] exception not to show acts the defendant took in preparation for the ultimate charged offense, but to show repeated acts that are similar to the charged offense.").

strongly the evidence serves to make more or less probable the existence of a fact of consequence to the litigation, coupled with the proponent's need for that item of evidence. *Id.* In other words, when the proponent of the evidence "has other compelling or undisputed evidence," the probative value of the evidence "will weigh far less than it otherwise might in the probative-versus-prejudicial balance." *Id.*, *quoting Montgomery*, 810 S.W.2d at 390. But as Appellant argues in his sufficiency point, the State had no direct evidence for this element. Valdez never directly discussed the nature of his scheme with Appellant. The State therefore needed the fact of the Harris County investigation as an important circumstance to demonstrate Appellant's knowledge that Valdez's referrals were not proper.

The third *Gigliobianco* factor--the tendency to suggest a decision on an improper basis--is either neutral or tilts towards the State. The factor considers unfair prejudice, commonly but not exclusively, generated through an emotional appeal. *Gigliobianco*, 210 S.W.3d at 641; *Montgomery,* 810 S.W.2d at 389. For example, evidence might be unfairly prejudicial if it arouses jury hostility or sympathy for one side without regard to the logical probative force of the evidence. *Id.* The facts of the Harris County investigation were somewhat more salacious than the Montgomery County case in the sense that the complaining witness expressed she was not even injured, but this fact was elicited first by Appellant and we do not include it in our consideration. Appellant contends that the Harris County matter caused the jury to convict him for "purchasing" cases, and not for merely permitting solicitations in the first thirty days. By the time this evidence came in, however, Valdez had already testified that Appellant had purchased clients from him. That cat was already out of the bag.

The fourth and fifth factors--the potential to cause confusion and tendency to be given undue weight by the jury--are also neutral on this record. The prosecutor focused on the limited

purpose of the evidence in closing, and the trial court properly gave a limiting instruction in trial, and in the jury charge. The evidence was not overly technical and it did not raise any issue a jury would be unequipped to handle. Nor did the evidence consume an inordinate amount of time. The trial court limited the presentation time for this issue. The testimony appears in seventeen pages of Appellant's testimony and thirty-three pages of Ms. Baker's testimony. The total trial testimony spans some 1100 pages.

Based on the presumption that the probative value of relevant evidence exceeds any danger of unfair prejudice, our review of the record, and the relevant Rule 403 criteria, we conclude the probative value of the extraneous offense evidence was not substantially outweighed by any prejudicial impact. This evidence was not cumulative of other evidence, and its presentation was concise. It had little, if any, tendency to mislead or confuse the jury, and any such tendency was outweighed by its probative value to rebut Appellant's contention that Valdez's client referrals were legal and above board. Finding no abuse of discretion, we overrule Appellant's second issue.

## VENUE

In his third issue, Appellant claims the State brought the case in the wrong venue. Each of the five traffic accident clients lived in Harris County, as are Appellant's two law offices. The sole connection of this case to Montgomery County rests with Robert and Crystal Valdez who office out of their home in Conroe (located in in Montgomery County). Crystal would have worked from her home computer terminal to obtain traffic accident reports from Harris County. She then initiated phone calls from Conroe to the accident victims to set-up the initial meeting. Nothing suggests that Appellant was aware of the connection of Montgomery County to the scheme.

**Standard of Review and Applicable Law**

The State carries the burden of proving venue by a preponderance of the evidence. TEX.CODE CRIM.PROC.ANN. art. 13.17 (West 2015); *Fulmer v. State*, 401 S.W.3d 305, 317 (Tex.App.--San Antonio 2013, pet ref'd). "Venue . . . may be proved by circumstantial as well as direct evidence. It is sufficient if from the evidence the jury may reasonably conclude that the offense was committed in the county alleged." *Rippee v. State*, 384 S.W.2d 717, 718 (Tex.Crim.App. 1964). Moreover, we presume the State proved venue at trial unless it was disputed or the record affirmatively shows the contrary. TEX.R.APP.P. 44.2(c)(1); *Schmutz v. State*, 440 S.W.3d 29, 35 (Tex.Crim.App. 2014). Venue is not synonymous with jurisdiction, which is the power of the court to hear and decide the case. *Fairfield v. State,* 610 S.W.2d 771, 779 (Tex.Crim.App. 1981). Moreover, venue is not a "criminative fact" and therefore is not an element of the offense. *Schmutz*, 440 S.W.3d at 35-39.

**Analysis**

There is no specific venue statute for barratry. Accordingly, venue is proper in the county in which the offense was committed. TEX.CODE CRIM.PROC.ANN. art. 13.18 ("If venue is not specifically stated, the proper county for the prosecution of offenses is that in which the offense was committed."). Part of the solicitations that Appellant permitted on his behalf originated from Montgomery County. Valdez testified that he hand-delivered some completed agreements to Appellant, but also faxed others. Photos documented a fax machine in Valdez's home office in Montgomery County. While Appellant may not have appreciated that fact, we find no *mens rea* requirement for venue. We therefore conclude that the State proved proper venue by a preponderance of the evidence.

## Harm Analysis

Were we wrong in that conclusion, Appellant has also not shown harm. The failure to prove venue does not implicate a structural or constitutional error. *Schmutz*, 440 S.W.3d at 35-39. As such, venue challenges are subject to the harm analysis under TEX.R.APP.P. 44.2(b)(any other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded); *Schmutz*, 440 S.W.3d at 35-39.

Harm is sometimes claimed when the State engages in forum shopping, or trial in the wrong county impairs a defendant's ability to present a defense, or subjects the defendant to a biased jury pool. *Schmutz,* 440 S.W.3d at 40 (considering but rejecting inconvenience and bias based on record in that case); *Thompson v. State*, 244 S.W.3d 357, 365-66 (Tex.App.--Tyler 2006, pet. dism'd). None of those arguments are made here. Rather, Appellant claims harm because had the case been brought in Harris County, its earlier barratry investigation would not have been admissible. He contends that the proffers to the Harris County District Attorney's office were made under the condition that any statements would be "excludable in any future Harris County proceedings." As support for that contention, Appellant cites to the Montgomery prosecutor's argument made to the trial court. However, the prosecutor only stated that "the proffer was made under conditions that it wouldn't be used against him in that proceeding down there." The actual agreement with the Harris County District Attorney's Office is not included in the record. We also note that Appellant made an initial recorded statement to the prosecutor, and then apparently several more proffers. Only the substance of the statement was admitted at the trial. The record fails to show, therefore, that the condition imposed on the proffers is at all relevant to this proceeding. We accordingly overrule issue three.

29

**CONCLUSION**

After reviewing each of Appellant's three issues, we overrule each and affirm the conviction below.

November 29, 2017

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rodriguez, and Palafox, JJ.

(Do Not Publish)