

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-17-00382-CR

_____

ARCHER BERNARD JOHNSON, Appellant

V.

THE STATE OF TEXAS

On Appeal from Criminal District Court No. 2
Tarrant County, Texas
Trial Court No. 1452126D

Before Gabriel, Kerr, and Womack, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

## I. INTRODUCTION

Twenty-two-year-old Veronica Contreras was working as a Family Dollar assistant manager when she saw Appellant Archer Bernard Johnson put four bottles of Caress body wash in his pants before he left the store, activating the shoplifting detector. After Contreras chased Johnson into the corridor between the store's inner and outer doors, where there were no surveillance cameras, he punched her in the face with his right fist and told her, "Back up, bitch." Johnson then escaped in an older model black Mustang bearing a "Monty Hale" dealership sticker. Police used the vehicle's description and the store's surveillance video to identify Johnson, and a jury found him guilty of robbery.[1]

In five points, Johnson appeals, complaining that the trial court abused its discretion by making four erroneous evidentiary rulings and by overruling his jury-argument objection. We affirm.

---

[1]Johnson was indicted for having, on or about April 12, 2016, intentionally or knowingly caused bodily injury to Contreras by hitting her with his hand while in the course of committing theft of property and with the intent to obtain or maintain control of the property. *See* Tex. Penal Code Ann. § 29.02(a). The indictment included a habitual offender notice, and after the jury found him guilty, the trial court found the enhancement paragraph true and assessed twenty-five years' confinement as his punishment. *See id.* § 12.42 (providing for enhanced punishment ranges).

## II.  DISCUSSION

### A.    Evidentiary Points

In his first, third, fourth, and fifth points, Johnson complains that the trial court abused its discretion by erroneously admitting the statement that Juana Jazmin Orta, another Family Dollar employee, gave to the Fort Worth police; by allowing Fort Worth Police Detective Edward Raynsford to give his opinion of Contreras's credibility; by allowing hearsay into evidence during Detective Raynsford's testimony; and by admitting into evidence during the trial's punishment phase two prior convictions that could not be sufficiently linked to him.  The State responds that Johnson did not preserve his first and third points and that the trial court did not abuse its discretion with regard to his fourth and fifth points.

### 1.    Standard of Review

The admissibility of evidence is within the trial court's discretion and will not be overturned absent an abuse of discretion. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003); *Smith v. State*, 316 S.W.3d 688, 698 (Tex. App.—Fort Worth 2010, pet. ref'd).  So long as the trial court's ruling lies within the zone of reasonable disagreement, the appellate court should affirm. *Moses*, 105 S.W.3d at 627; *Smith*, 316 S.W.3d at 698.  And if the trial court's evidentiary ruling is correct under any applicable legal theory, it will not be disturbed, even if the trial court gave an incorrect or insufficient reason for the ruling. *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016).

If the trial court abused its discretion but its ruling merely offends the rules of evidence, then the erroneous admission of evidence is nonconstitutional error governed by rule 44.2(b). *See Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001). Rule 44.2(b) requires us to disregard any nonconstitutional error that does not affect appellant's substantial rights. Tex. R. App. P. 44.2(b). An error that has a "substantial and injurious effect or influence in determining the jury's verdict" affects a substantial right. *Haley v. State*, 173 S.W.3d 510, 518 (Tex. Crim. App. 2005); *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)). Conversely, an error does not affect a substantial right if we have "fair assurance that the error did not influence the jury, or had but a slight effect." *Solomon*, 49 S.W.3d at 365; *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

In determining whether an error affected an appellant's substantial rights, we review the record as a whole, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). We may also consider the jury instructions, the State's theory and any defensive theories, whether the State emphasized the error, closing arguments, and even voir dire, if applicable. *Haley*, 173 S.W.3d at 518–19; *Motilla*, 78 S.W.3d at 355–56.

4

## 2. Orta's Statement to Police

During her direct testimony, Orta stated that she stood at the cash register and saw Contreras run after Johnson and that "from what [she] saw from the glass panel [the area between the store's inner and outer doors], [she] saw a fist going into [her] co-worker's face." Orta said that because of a glare from the glass, she did not see perfectly but "did see a man punching [Contreras]" and that Contreras subsequently confirmed to Orta that she had been hit in the face.

When Orta did not recall exactly what Johnson said to Contreras when he hit her, the prosecutor showed to Orta her written police statement to refresh her recollection. After silently reviewing her statement, Orta said that she heard Contreras scream, "Hey," and then Johnson replied, "Don't get close to me, bitch."

After the prosecutor passed the witness, the defense asked a few questions before handing Orta her written statement again, and the following dialogue ensued:

> Q. All right. I want you to take however much time you need and look at that carefully, and I need you to tell me if anywhere in this statement you say anything to the effect of this individual, Mr. Johnson, hit [Contreras,] your co-worker?
>
> A. *Yeah, it says it on the paper.*
>
> Q. It does? Okay.
>
> Now that your memory has been refreshed, go ahead and rely on that statement and tell me what you think you saw that day.
>
> A. Okay. Well, the incident itself, I remember being around the register and I was getting closer because I saw [Contreras] run after him.

5

And when I was looking, I was able to see through the window of his fist going directly towards her face.

Q.  Okay.  A fist going towards her face?

A.  Yes.

Q.  That I can understand.  You saw some object, being his fist, going in the direction of her face.  But that's not hitting, is it?  I mean, that's not the same thing, right?

A.  I mean, no.

Q.  Okay.  And do you see anything else in your statement that resembles anything like an allegation of actual contact hit or do you see things that indicate that you saw something going on but --

A.  *I do see things that indicate that.*

Q.  Indicate that. Okay. Like what?

A.  *Right here* (indicating).

Q.  That she was attacked?

A.  Yes. There's not enough space there so I didn't fully go into detail.

Q.  *You also say in your statement that she saw a fist by her face?*

A.  Well, I saw a fist going to her face.

Q.  But you just told me a minute ago you're not sure you actually saw any contact; is that correct? I want to make sure we're --

A.  I saw -- well, I didn't see the contact but I saw going towards her.

Q.  Okay. You did not see an actual hit?

A.  No.

Q. Because you saw the fist going toward her but not the conclusion of an attack?

A. No, because there was a glare.

Q. You couldn't see?

A. Yeah.

Q. Understood. Sure. Thank you, ma'am. [Emphasis added.]

Defense counsel directed Orta to read the first line of her statement to herself again, and when he asked her if she thought Contreras had assisted Johnson as a customer that day, she replied, "It was two years ago. If I stated it, she probably did assist him. But I don't recollect up to this point, but *on paper I did write that she was assisting him.*" [Emphasis added.]

On a third occasion during cross-examination, defense counsel asked Orta to review her statement again and then to describe how Johnson left the store. Orta said that he walked to the exit and then took off once the detectors sounded. She noted that State's Exhibit 3, a photograph taken from the surveillance video, showed Johnson walking, and said "yes," when asked whether the portion of her written statement, "when you say you *saw him running to the door,*" was inaccurate. [Emphasis added.] When he asked whether she had made some mistakes and inconsistent statements during her testimony, Orta agreed.

When defense counsel passed the witness, the prosecutor asked to admit Orta's written statement under the rule of optional completeness and as a prior consistent

statement. Defense counsel responded that the statement should not come in because nothing had been admitted into evidence yet, because both sides had been able to talk about the parts they thought were relevant, and because admission of the statement would violate Johnson's confrontation right. The trial court ruled that it would admit the statement "under the rule of optional completeness." The prosecutor read the statement to the jury, and the written statement itself was admitted as State's Exhibit 6.

In her statement, Orta wrote,

> *I witnessed my co-worker assisting an African-American male* with a Black windbreaker, with a hat and dark Jeans.[2] He was carrying bread and [I] noticed that he went to the back of the store while my co-worker was in the front with me.[3] I was in front of the register when I saw the man walking to the entrance without the bread.[4] *I then saw him run to the door* which was when the tag detector went off[5] and so *my co[-]worker followed*

---

[2]State's Exhibits 1, 2, and 3—photographs taken from the Family Dollar surveillance cameras—were admitted into evidence without objection during Orta's testimony and show a black male wearing a black cap with a blue bandanna underneath it, a gray T-shirt, a black windbreaker, and light blue jeans.

[3]Orta testified without objection that she had seen Johnson grab a loaf of bread and walk around the store and that when he left the store, he no longer had the loaf of bread. Contreras also testified without objection that Johnson had picked up bread but did not purchase it.

[4]During Contreras's testimony, the State offered, and the trial court admitted without objection, State's Exhibit 10, which is surveillance footage from Family Dollar. The first camera shows Johnson walk into the store through the exit door and then speed-walk out a minute or so later without any bread. The third camera shows Orta working the cash register.

[5]The sixth camera shows the tag detector being triggered as Johnson walks through, followed by Contreras and Orta.

8

*him and said "hey" and I caught a glimps[e] of a fist towards her face and the man yelled out[,] "[D]on't get closed to me b\*\*\*\*"* and left in an older model [M]ustang[,][6] but when he said what he said[,] *I saw the fist by her face* and she was close to the exiting door. The passenger was the male and a female was the driver[,] [I] did not get to see her appe[a]rance and the car had no tags[.][7] I was near the first register and *saw a glimps[e] of the attack* but ran towards the door when I heard a slam[.][8] [Emphasis added.]

In his first point, Johnson complains that the trial court abused its discretion by admitting into evidence Orta's written statement because it was not admissible either under an "optional completeness" theory or as a prior consistent statement, and he directs us to *Sauceda v. State*, 129 S.W.3d 116 (Tex. Crim. App. 2004) (op. on reh'g),[9] as

---

[6]Contreras testified that Johnson escaped in an older model black Mustang with a Monty Hale sticker on the back.

[7]Contreras testified that a chubby black female was driving the older model Mustang. In her 911 call, which was admitted into evidence without objection and published to the jury, Contreras told the dispatcher that a black male wearing a black windbreaker and blue jeans stole "some stuff," punched her in the face when she approached him as he was leaving, and left with a female who was driving an older-version black car with no license plates and a "Monty Hale" decal.

[8]State's Exhibit 10 shows Orta run out after Johnson and Contreras.

[9]In *Sauceda*, an aggravated-sexual-assault-of-a-child case, the defendant had to choose between either impeaching the complainant's testimony by introducing the testimony of the CPS caseworker who had interviewed the complainant and the admission of the entire videotaped CPS interview or not calling the caseworker as a witness at all. 129 S.W.3d at 117–19. The CPS caseworker would have testified that the specific subject of weapons used to threaten the complainant into submitting to sexual assault was never raised during the interview, either by the complainant or the interviewer, and the video contained extraneous offense evidence about two other children. *Id.* at 118, 123. The defendant opted not to call the witness and was convicted. *Id.* at 118–19. The court of criminal appeals held that simply asking the CPS caseworker a question for impeachment purposes would not render the

9

"on point with [his] situation." Johnson argues, as he did in the trial court, that nothing had been "admitted" into evidence when the State invoked rule 107. *Cf.* Tex. R. Evid. 106 (stating that if a party introduces all or part of a writing or recorded statement, an adverse party may introduce, at that time, any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time). Johnson also states that nothing in his cross-examination made it "necessary to explain" the discussed portions by reference to the whole statement.

The State responds that, assuming at least part of the exhibit contained admissible evidence, Johnson failed to preserve the portion of his complaint that introduction of the entire statement was unwarranted because he did not object to the

---

complainant's entire videotaped CPS interview admissible under rule of evidence 107. *Id.* at 117.

As characterized by the court, the State had argued that "the mere fact of the [CPS caseworker's] limited testimony in response to the [defense's] proffered question would trigger the automatic admission of the video in its entirety," without a showing of necessity. *Id.* at 120, 124. The court disagreed because although the videotape's existence was mentioned frequently during cross-examination, the defense had made no attempt to introduce the recording itself into evidence; the CPS caseworker was available to testify to the matters contained in the recording; the defense had committed the complainant to her testimony and then sought to introduce the CPS caseworker's testimony to impeach the complainant; the impeachment turned on the *absence* of a statement, rather than the existence of any directly contradictory statement; the videotape contained extraneous offense evidence that would have been difficult to redact; and—under the circumstances unique to *Sauceda*—there was little danger of misleading the jury through the presentation of statements taken out of context. *Id.* at 118–19, 122–23. Accordingly, the court concluded that the State's "opening the door" argument, which required the automatic admission of the videotape, was "completely without support." *Id.* at 123.

specific parts of Orta's statement that were inadmissible, i.e., not on the same subject as his cross-examination, or ask the trial court to redact those parts of the statement.

The State further responds that without the admission of Orta's entire statement, the jury would have been unable to determine for itself if her testimony had been inaccurate or inconsistent, and it contends that *Sauceda* is not on-point because Johnson's specific inquiries about the contents of Orta's statement—especially his "global accusations of inaccuracy and inconsistency between her statement and her testimony"—rendered her entire statement admissible to assist the jury in determining her credibility.[10] And the State points out that even if the trial court abused its discretion by admitting Orta's statement, it was harmless in light of all of the other facts admitted through other sources.

> Texas Rule of Evidence 107, the "Rule of Optional Completeness," provides,
>
> If a party introduces part of an act, declaration, conversation, writing, or recorded statement, an adverse party may inquire into any other part on the same subject. An adverse party may also introduce any other act, declaration, conversation, writing, or recorded statement that is necessary to explain or allow the trier of fact to fully understand the part offered by the opponent. "Writing or recorded statement" includes a deposition.

Tex. R. Evid. 107. Rule 107 is an exception to the hearsay rule that permits the introduction of otherwise inadmissible evidence when that evidence is necessary to

---

[10]We agree that *Sauceda* is not on-point. As set out in our summary of that case and our factual recitation of this portion of Orta's testimony, the facts and circumstances in *Sauceda* were completely different from those before us here.

fully and fairly explain a matter "opened up" by the adverse party. *Walters v. State*, 247 S.W.3d 204, 218 (Tex. Crim. App. 2007). It is designed to reduce the possibility of the jury receiving a false impression from hearing only a part of some act, conversation, or writing, and it is not invoked by the mere reference to a document, statement, or act. *Id.* Rather, it takes effect when other evidence has already been introduced but is incomplete and misleading. *Stewart v. State*, 221 S.W.3d 306, 312 (Tex. App.—Fort Worth 2007, no pet.). To be admitted under the rule, the omitted portion of the statement must be on the same subject and must be necessary to make it fully understood. *Hailey v. State*, 413 S.W.3d 457, 468 (Tex. App.—Fort Worth 2012, pet. ref'd).

During Orta's direct examination, the prosecutor did not attempt to introduce Orta's written statement but instead drew out Orta's testimony that she saw a fist go into Contreras's face but did not see it perfectly from her vantage point and that, after reviewing her written statement, she heard Contreras scream "Hey" and Johnson reply, "Don't get close to me, bitch."

On cross-examination, defense counsel had Orta review her statement again and asked her if she said anywhere in her statement that Johnson hit Contreras, and Orta replied, "Yeah, *it says it on the paper*," introducing before the jury, for the first time, part of the recorded statement. [Emphasis added.] Orta then indicated, "Right here," when defense counsel asked her where she saw anything in her statement that "resembles anything like an allegation of actual contact hit." Later in cross-

12

examination, Orta said, "[O]n paper I did write that she was assisting [Johnson]" and agreed that it was inaccurate when asked about the portion of her statement that she "saw him running to the door." Thus, on redirect, the State was entitled to inquire about the portions of Orta's statement on the same subjects—the assault, Contreras's pre-assault contact with Johnson, and how and when Johnson left the store—to the extent that the jury was left with an incomplete or misleading impression, and to introduce any other act, declaration, conversation, writing, or recorded statement necessary to explain or allow the jury to fully understand these portions that were referenced during cross-examination. *See* Tex. R. Evid. 107; *Hailey*, 413 S.W.3d at 468.

While the remaining portions of the written statement were not admissible under rule 107, Johnson did not seek to have them redacted, *see Whitaker v. State*, 286 S.W.3d 355, 369 (Tex. Crim. App. 2009), and those facts—what Johnson was wearing, his behavior in the store prior to his escape, and the appearance of the getaway vehicle and its driver—were admitted without objection during other portions of the guilt/innocence phase of trial, rendering any error harmless. *See* Tex. R. App. P. 33.1; *see also Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003) ("An error in the admission of evidence is cured where the same evidence comes in elsewhere without objection."). We overrule Johnson's first point.

13

### 3.   Detective Raynsford's Opinion Testimony

During Detective Raynsford's redirect testimony, the following dialogue ensued after he testified that it was not realistic or economical to have crime scene investigators come to every single shoplifting incident.

> Q.  Okay. And how do you evaluate cases where you're just not going to have additional witnesses? Like what is your analysis of that whenever you meet these people and you have to decide whether or not they're credible?
>
> A.  *The credibility of the victim, in this case she appeared to be very sober* --
>
> [Defense counsel]:  Judge, I'm going to object. This is invading the province of the jury.
>
> I mean, he can testify about getting probable cause, but he can't testify on the ultimate credibility issue.  That's up to the jury.
>
> [Prosecutor]:  The detective is speaking on his -- based off his training and experience in dealing with people how he has to evaluate that.  He has to evaluate the victim --
>
> THE COURT:  Yeah, I'll allow it. I'll allow it. He's a detective.  He's seen this before.
>
> [Prosecutor]:  Okay.  Thank you, Judge.
>
> Q.  [By prosecutor]:  Can you please go ahead and elaborate?
>
> A.  *In this case the victim appeared to be very straightforward, honest. Appeared to be [a] very credible individual.*  She was not involved in any kind of criminal activity at the time this happened.  She was just working, and the video evidence backed up everything that she said except for the lack of seeing the punch on video.
>
> Q.  Are there times where people call the police and you're given a case and you meet with the victim and you don't believe them?

A. Yes.

Q. And what do you do with cases that are like that?

A. In certain cases like that if there's a reason to have probable cause to believe it can be proven, I will have that person arrested for making a false report to the police officer. [Emphasis added.]

In his third point, Johnson contends that the trial court abused its discretion by allowing Detective Raynsford to give his opinion about Contreras's credibility. The State responds that Johnson failed to preserve most of this point for our review—specifically, the detective's testimony that Contreras appeared to be straightforward, honest, and credible—and that the preserved portion of his objection—that Contreras appeared to be very sober—was harmless because Contreras testified at trial and was subjected to a full cross-examination by Johnson, allowing jurors to assess her credibility for themselves.

Generally, to preserve an evidentiary error for our review, a party must object each time the objectionable evidence is offered. *Geuder v. State*, 115 S.W.3d 11, 13 (Tex. Crim. App. 2003); *Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003); *Clay v. State*, 361 S.W.3d 762, 766 (Tex. App.—Fort Worth 2012, no pet.). Johnson did not object to the detective's testimony that Contreras appeared very straightforward, honest, and credible. Accordingly, we overrule this portion of his third point and consider whether the preserved portion of his complaint affected his substantial rights, reviewing voir dire, opening arguments, the evidence at trial, the

15

jury charge, the parties' theories, and closing arguments. *See Haley*, 173 S.W.3d at 518–19; *Motilla*, 78 S.W.3d at 355–56.

After a jury shuffle, the prosecutor talked with the venire panel about robbery involving bodily injury, the burden of proof, the Fifth Amendment privilege against self-incrimination, the presumption of innocence, and their general attitudes toward law enforcement. She also reminded them that the State did not get to pick its witnesses, that "credibility is gained or lost by what comes out of their mouth[s]," and that people can have different reactions to the same situation. The defense revisited the presumption of innocence and the Fifth Amendment privilege, asking the venire to indicate how strongly they agreed or disagreed with these concepts. He also revisited reasonable doubt.

During opening statements, the prosecutor told the jury that the evidence would show that Contreras saw Johnson put four bottles of body wash in his pants and when she called him on it, he punched her in the face and escaped in a black Mustang bearing a Monty Hale sticker. She acknowledged that the store's surveillance video would not show the assault. The defense told the jury that they would see holes in the entire scenario—an assault did not occur, a theft did not occur, and neither occurred together to create a robbery—and that the holes in the case created reasonable doubt.

The evidence in the case reflected that Contreras and Orta were working at the Family Dollar on April 12, 2016, when Johnson came in around 8 p.m., spent three

minutes in the store, and set off the shoplifting sensor when he left. Contreras testified that she saw Johnson take four bottles of body wash and put them in his pants, and when he set off the shoplifting sensor, she approached him, and he punched her in the jaw, said "Back up, bitch," and left with the body wash.

Contreras told Orta that Johnson had hit her in the face, and Orta said that she saw the mark on Contreras, but Contreras said that although she was surprised not to have been bruised, the impact of Johnson's fist did not bruise her. During cross-examination, Contreras said, "Yes," when asked if she recalled telling the responding police officer, who asked about the hit, "Yeah, but I'm still pretty so it's okay." Contreras said that it hurt when Johnson hit her but that it caused her more numbness than pain. Orta testified that she did not see the impact but saw a fist going toward Contreras's face and heard Johnson say something like, "Hey, don't touch me, bitch." Contreras identified Johnson in a photo lineup.

Both Orta and Contreras testified that Johnson escaped in an older model black Mustang with no license plates that was driven by a woman. Contreras said that it had a "Monty Hale" sticker on the back. Craig Hubbard, from Monty Hale Auto Sales, testified that in April 2016, the Fort Worth police asked him to see if the company, a "buy here, pay here, tote-the-note" operation, had sold a 2000 black Mustang with no plates to a male and a female. He used the company's database to identify Johnson as one of the two buyers of a black Mustang in February 2016. A police officer testified that Johnson was seen near a black Mustang before his arrest.

17

Johnson's wife or girlfriend drove the black Mustang identified by Hubbard to a voluntary interview with the police.

The jury charge included an instruction on the presumption of innocence, the Fifth Amendment privilege against self-incrimination, and the State's burden to prove every element of the offense beyond a reasonable doubt. The charge also contained the lesser-included offenses of theft and assault causing bodily injury.

The prosecutor focused on the economics of theft during her closing argument and then argued Contreras's, Orta's, and Detective Raynsford's credibility, but she did not emphasize Detective Raynsford's opinion of Contreras. The defense responded by arguing that only one person's testimony—Contreras's—proved both theft and assault because Orta did not see either one. He attacked Contreras's credibility and pointed out that the lack of physical evidence in the case was because the Fort Worth police took "shortcut[s]" instead of bringing crime scene investigators to the store.

In rebuttal, the prosecutor argued that it was unreasonable and "beyond the budget" to expect fingerprints on thousands of items in a store and returned to Contreras's credibility, arguing, "Are victims going to be penalized because their crime wasn't in a picture perfect way or are you going to hold people accountable who refuse to just simply pay what they owe?"

Having reviewed the record as a whole, we agree with the State that the preserved portion of Johnson's third point—Detective Raynsford's opinion that Contreras appeared very sober—was harmless, particularly with regard to the fact that

18

Contreras testified, allowing the jurors to assess her credibility for themselves, and in light of Detective Raynsford's cross-examination, during which he acknowledged that sometimes witnesses made mistakes and that detectives and jurors could take those mistakes into consideration when weighing credibility. *See Sandoval v. State*, 409 S.W.3d 259, 293 (Tex. App.—Austin 2013, no pet.) ("The erroneous admission of expert testimony is non-constitutional error."). We overrule the remainder of Johnson's third point.

### 4. Hearsay

In his fourth point, Johnson contends that the trial court abused its discretion by allowing Detective Raynsford to introduce hearsay through his implied assertion that Hubbard gave him Johnson's name. He complains that Detective Raynsford testified that he learned Johnson's name and Hilda Jerry's name after he contacted the Monty Hale dealership, that "the context overwhelmingly demonstrates that [Detective] Raynsford was told [Johnson's] name by Mr. Hubbard," and that "the jury could not help but be influenced by the out-of-court statement of Mr. Hubbard that [Johnson] bought the car that was identified at the scene."

The State responds that any error must be disregarded because the same facts were admitted without objection during Hubbard's testimony.

The day before Detective Raynsford's testimony, Hubbard testified that the Fort Worth police had asked him about a 2000 black Mustang with no plates that had a male owner, a female owner, and a "Monty Hale" decal on the back. After he

19

searched the company's database and found two or three black Mustangs, he factored in the lack of license plates, which indicated a new buyer, narrowing his search results to one vehicle that had a male buyer and a female buyer on its contract: Johnson and Jerry. In conjunction with the Mustang's sale, Monty Hale employees had taken photographs of Johnson's and Jerry's driver's licenses and social security cards. Hubbard gave this information to the Fort Worth police. He also identified State's Exhibits 4 and 5, which were admitted into evidence without objection, as photographs of the Mustang and noted that its temporary plate had the vehicle identification number that matched the one for Johnson and Jerry on the vehicle's Monty Hale sales contract.[11]

Johnson failed to preserve this complaint for our review when the same facts were admitted into evidence without objection during Hubbard's testimony. *See* Tex. R. App. P. 33.1; *Valle*, 109 S.W.3d at 509; *see also Clay v. State*, 240 S.W.3d 895, 905–06 (Tex. Crim. App. 2007) ("The erroneously admitted evidence established little, if anything, negative about appellant that was not also well established by the properly admitted evidence."). We overrule his fourth point.

---

[11]The following day, Detective Raynsford testified, without objection, that State's Exhibits 4 and 5 were photographs of the vehicle that Jerry, who was either Johnson's wife or his girlfriend, was driving when she drove to the police station at his request for a voluntary interview.

### 5. Admission of Prior Convictions

In his fifth point, Johnson complains that the trial court abused its discretion by admitting into evidence copies of two of his prior convictions despite their lack of legible fingerprints. The State responds that it proved beyond a reasonable doubt that Johnson was the person who was convicted of the offenses shown in State's Exhibits 17 and 18.

To establish that a defendant has been convicted of a prior offense, the State must prove beyond a reasonable doubt that a prior conviction exists and that the defendant is linked to that conviction, but no specific document or mode of proof is required to prove these two elements. *Henry v. State*, 509 S.W.3d 915, 918 (Tex. Crim. App. 2016) (quoting *Flowers v. State*, 220 S.W.3d 919, 921 (Tex. Crim. App. 2007)). One example of acceptable evidence is "documentary proof which contains sufficient information to establish that a prior conviction exists and the defendant's identity as the person convicted." *Id.* A certified judgment, on its own, is insufficient to prove a prior conviction, *id.* at 919, but there is no "best evidence" rule in Texas that requires that the fact of a prior conviction be proven with any document, much less any specific document. *Flowers*, 220 S.W.3d at 921. A computerized criminal history file maintained by DPS and corroborated by police agency records, both bearing a defendant's "unique identifier" number, for example, can be sufficient to establish prior offenses. *Ex Parte Warren*, 353 S.W.3d 490, 490, 494–95 (Tex. Crim. App. 2011)

21

(noting that out-of-state disposition report to FBI and DPS computerized criminal history record both contained the same FBI number, a unique personal identifier).

"Regardless of the type of evidentiary puzzle pieces the State offers to establish the existence of a prior conviction and its link to a specific defendant, the trier of fact determines if these pieces fit together sufficiently to complete the puzzle." *Flowers*, 220 S.W.3d at 923. We apply the *Jackson* standard to determine whether the State offered sufficient proof of a prior conviction. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) ("[T]he *Jackson v. Virginia* legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt.").

Johnson's punishment trial was to the trial court. Corporal James Blaszak of the Tarrant County Sheriff's Office testified that he had been a fingerprint expert for fourteen or fifteen years and that he had fingerprinted Johnson earlier that week. The trial court admitted into evidence without objection State's Exhibits 11 and 12, the fingerprint card that Corporal Blaszak created of Johnson's fingerprints on November 7, 2017, and the certified copy of Johnson's fingerprint card kept in the Identification Bureau of the Tarrant County Sheriff's Office. Both cards listed Johnson's date of birth. Corporal Blaszak testified that Tarrant County assigns a unique county identification (CID) number to each inmate upon his first arrest. He

also explained that the Texas Department of Corrections assigns a unique state identification (SID) number or Department of Public Safety (DPS) number to each inmate upon his first entry into the correctional system and that those numbers are thereafter attached to that inmate's fingerprints.

The State offered into evidence Johnson's prior convictions in State's Exhibits 13, 14, 15, 16, 17, and 18. Corporal Blaszak testified that he had matched Johnson's fingerprints in State's Exhibit 11 to the fingerprints in State's Exhibits 13, 14, 15, and 16—penitentiary packets—but that he matched the SID number—03161770—on State's Exhibits 17 and 18, which were judgments of conviction, to the same SID number in the penitentiary packets. State's Exhibits 13, 14, 15, and 16 were admitted without objection, but defense counsel objected to State's Exhibits 17 and 18, complaining that "the prints don't match."

All of the exhibits contained variations of Johnson's name[12] and listed the same numerical identifier, 03161770. Three of the exhibits—13, 14, and 15—listed

---

[12]State's Exhibit 13's judgment of conviction and fingerprint card listed "Archie B. Johnson" as the defendant. State's Exhibit 14's judgment of conviction listed the defendant as "Archie Johnson," but the accompanying fingerprint card listed the defendant's name as "Archie Bernard Johnson." State's Exhibit 15's judgment of conviction and fingerprint card listed the defendant as "Archie Bernard Johnson." State's Exhibit 16's judgment of conviction listed the defendant as "Archer B. Johnson." State's Exhibit 17's judgment of conviction listed the defendant as "Archie Bernard Johnson," although "Archie" is lined out and "Archer" is written in. It is unclear from the record who made this correction or when it was made. State's Exhibit 18's judgment of conviction listed the defendant as "Archer Bernard Johnson."

23

Johnson's date of birth and contained his photograph.[13]  State's Exhibit 16, a 2010 marijuana possession conviction from Harris County, contained Johnson's right thumbprint.  State's Exhibit 17, a 2011 delivery-of-a-simulated-controlled-substance conviction from Harris County, contains a right thumbprint, as does State's Exhibit 18, a 2015 assault-causing-bodily-injury-to-a-family-member conviction from Tarrant County, but Corporal Blaszak testified that on these two exhibits, he could not identify the thumbprints because they were "kind of blended together" and "too dark to actually pick out the features."

After Johnson raised his objection to State's Exhibits 17 and 18, Corporal Blaszak explained that when a good fingerprint is lacking, a defendant can be linked to a judgment and sentence through his SID or CID number.  He then testified that Johnson's SID number on State's Exhibits 17 and 18 matched the SID number on Johnson's unobjected-to penitentiary packets.

The trial court had sufficient evidence to link State's Exhibits 17 and 18 to Johnson without the necessity of matching his fingerprints to the judgments in those exhibits based on his name and unique state identification number, which, along with the photographs from his earliest convictions and the variations of his name

---

[13]State's Exhibit 13, the penitentiary packet for Johnson's 1983 burglary-of-a-building conviction from Dallas County, State's Exhibit 14, the penitentiary packet for Johnson's 1984 unauthorized-use-of-a-motor-vehicle conviction from Tarrant County, and State's Exhibit 15, the penitentiary packet for Johnson's 2002 burglary-of-a-building conviction from Dallas County, contained Johnson's photograph.

contained in all of his convictions, tied all of his unchallenged convictions to him. *See Warren*, 353 S.W.3d at 490, 494–95; *see also Lester v. State*, No. 02-16-00288-CR, 2018 WL 3763897, at *6 (Tex. App.—Fort Worth Aug. 9, 2018, pet. ref'd) (mem. op., not designated for publication) ("[O]ur precedent is replete with cases holding that matching CID numbers strongly support linking defendants with associated prior convictions."); *Sullens v. State*, No. 02-13-00364-CR, 2015 WL 3523143, at *3 (Tex. App.—Fort Worth June 4, 2015, pet. ref'd) (mem. op., not designated for publication) (holding that the evidence was sufficient to link appellant to the four complained-of judgments, which all contained his full name and the same date of birth and county identification number, when the same name, date of birth, and identification number appeared in the convictions that he acknowledged); *Goode v. State*, No. 02-10-00465-CR, 2011 WL 4502333, at *2 (Tex. App.—Fort Worth Sept. 29, 2011, pet. ref'd) (mem. op., not designated for publication) (stating that the factfinder could have found the evidence sufficient to link appellant to the two prior judgments submitted by the State "[g]iven that appellant's unique, nonrecycled CID appeared in relation to two Tarrant County convictions concerning a defendant with appellant's full name and birth date"); *Ortiz v. State*, No. 02-07-00397-CR, 2008 WL 4602243, at *2 (Tex. App.—Fort Worth Oct. 16, 2008, pet. ref'd) (mem. op., not designated for publication) (holding that the evidence was sufficient to link appellant to a prior felony conviction when although the prior judgment did not contain his unique CID number, the fingerprints taken at trial matched the jail card, which contained the

25

unique CID number, and which matched the CID number on the indictment of the prior felony conviction). We overrule Johnson's fifth point.

## B. Jury Argument

In his second point, Johnson argues that the trial court abused its discretion by overruling his objection to the prosecutor's closing-argument comment on his failure to testify. The State responds that the prosecutor's jury argument, when reviewed in context, did not refer to Johnson's failure to testify.

A court may not hold a defendant's failure to testify against him, and counsel may not allude to a defendant's failure to testify. U.S. Const. amend. V; Tex. Const. art. I, § 10; Tex. Code Crim. Proc. Ann. art. 38.08. To determine if a prosecutor's comment violated article 38.08 and impermissibly referred to an accused's failure to testify, we must decide whether the language used was plainly intended or was of such a character that the jury naturally and necessarily would have considered it to be a comment on the defendant's failure to testify. Tex. Code Crim. Proc. Ann. art. 38.08; *see Bustamante v. State*, 48 S.W.3d 761, 765 (Tex. Crim. App. 2001); *Fuentes v. State*, 991 S.W.2d 267, 275 (Tex. Crim. App. 1999). We must view the offending language from the jury's standpoint, and the implication that the comment referred to the accused's failure to testify must be clear. *Randolph v. State*, 353 S.W.3d 887, 891 (Tex. Crim. App. 2011); *Bustamante*, 48 S.W.3d at 765. A merely indirect or implied allusion to the defendant's failure to testify does not violate the accused's right to remain

silent. *Wead v. State*, 129 S.W.3d 126, 130 (Tex. Crim. App. 2004); *Patrick v. State*, 906 S.W.2d 481, 490–91 (Tex. Crim. App. 1995).

Orta testified that there was at least one shoplifter in every shift that she worked and that most, when caught, would give everything back so that the police would not be called. She also testified that body wash warranted a shoplifting sensor sticker because it was a high theft item. Contreras said that she approached people "[a]ll the time" and "[a]lmost every day" when the shoplifting detector activated and that a typical shoplifter would either return the stolen items or drop them and leave. When she worked for Family Dollar, she called the police about shoplifters, on average, five times a week. Detective Raynsford testified that it would not be economical or realistic to have crime scene investigators come out for every shoplifting incident.

During closing arguments, the prosecutor focused on the economics of theft, stating, "[T]he reason why we have sensors at doorways of businesses is because of people like the Defendant," whom she blamed for the rising cost of goods and the need for "an entire business of preventing people from stealing." She then argued Contreras's, Orta's, and Detective Raynsford's credibility.

The defense responded by arguing that Orta did not see either a theft or an assault, that Contreras's testimony was inconsistent, and that the Fort Worth police should have requested crime scene investigation but did not, resulting in a case with too many holes in the evidence to convict Johnson.

In rebuttal, the prosecutor argued,

*The State's issue with Archer Johnson is that he doesn't pay what he owes.* It's a very simple concept. You go to a store, you pay what you owe. And when it's time for you to be held accountable, *there was an opportunity for him to* abandon the mission, *accept responsibility by either paying for items or by saying, You know what, you got me, give them back and just go about his way.* Instead he punched a five-feet-tall young lady. Back up, bitch. Back up, bitch to five-foot-tall girl who is just trying to do her job. Another girl who's now a college student who now works at Best Buy who are just trying to do their job.

These girls are working and productive people. Every person we brought to this witness stand is a working and productive person. *They pay what they owe, they do their jobs and they go about their business.*

*There's only one person in this case who refuses to do that and refuses to accept responsibility and that is the Defendant.*

[Defense counsel]: Your Honor, I'm going to object. That's a comment on failure to testify.

THE COURT: Okay. That's overruled. It's just final arguments. Jury will recall the testimony. [Emphasis added.]

After the trial court overruled Johnson's objection, the prosecutor argued that it was completely unreasonable to expect crime scene investigation when shoplifting occurred so frequently and asked the jury "to hold people accountable who refuse to just simply pay what they owe[.]"

A prosecutor's comment on a defendant's refusal to take responsibility may be a comment on his failure to testify,[14] *see Roberson v. State*, 100 S.W.3d 36, 41 (Tex.

---

[14]In *Randolph*, the court explained that the State cannot argue, at either the guilt or punishment stage, that the defendant denied responsibility for a crime simply because he pleaded not guilty because simply pleading not guilty and demanding that

App.—Waco 2002, pet. ref'd), but if there is evidence in the record supporting the comment, then no error is shown. *Howard v. State*, 153 S.W.3d 382, 386 (Tex. Crim. App. 2004) (holding that when a witness had testified that the appellant told him he had no remorse, the prosecutor's argument was a proper summation of the evidence).

Here, based on the context of the prosecutor's initial and rebuttal arguments, we do not think that her language was plainly intended to comment on Johnson's failure to testify.[15] *See Bustamante*, 48 S.W.3d at 765 (stating that the context in which the comment was made must be analyzed to determine whether the language used was of such character that the jury would necessarily and naturally take it as a comment on the defendant's failure to testify). Rather, the prosecutor's focus appeared to be on his failure to pay for stolen merchandise and the costs associated with preventing shoplifting. *Cf. Thompson v. State*, 651 S.W.2d 785, 786 (Tex. Crim.

---

the State prove its case neither accepts nor denies responsibility. 353 S.W.3d at 892; *see also Archie v. State*, 340 S.W.3d 734, 740 (Tex. Crim. App. 2011) (holding that questions posed directly to defendant in closing argument regarding his present state of mind as he sat in the courtroom, coupled with the prosecutor's act of turning from the jury to face the defense, pointing, and taking a step or two towards the appellant, directly highlighted the fact that the appellant did not personally take the stand to testify).

[15]The jury charge also instructed the jurors that because Johnson had elected not to testify, the jurors could not "refer or allude to the fact throughout [their] deliberations or take it into consideration for any purpose whatsoever as a circumstance against him."

App. 1983) (en banc).[16]  Thus, the implication that Johnson had failed to testify was not clear, and we overrule Johnson's second point.

## III. CONCLUSION

Having overruled all of Johnson's points, we affirm the trial court's judgment.

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  September 12, 2019

---

[16]In *Thompson*, the court held that the prosecutor's argument, in conjunction with his physical actions and delivery, was manifestly intended to be, and was, of such a character that the jury would naturally or necessarily take it as a comment on the appellant's failure to testify when the prosecutor said, "[T]here is one person we haven't heard from in this case, who could testify a lot about what was going on, and that's Miss Turner here.  Tyler.  Excuse me."  651 S.W.2d at 785.  Defense counsel objected that the prosecutor had leered and looked directly at the defendant and nodded his head toward him before naming a State's witness who did not testify.  *Id.* at 785–86.  The court noted in a footnote that no reasonably competent prosecutor would, during jury summation, stand in proximity to the appellant and his attorneys and call the jury's attention to the absence and failure to testify of one of the *State*'s eye witnesses.  *Id.* at 786 n.2